**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| IPOX SCHUSTER, LLC, | ) | |
| | ) | Civil Action No. 15 C 9955 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | JURY DEMAND REQUESTED |
| | ) | |
| NIKKO ASSET MANAGEMENT CO., LTD. | ) | |
| | ) | |
| and | ) | |
| | ) | |
| LAZARD ASSET MANAGEMENT LLC, | ) | |
| | ) | |
| Defendants. | | |

## COMPLAINT

Plaintiff IPOX Schuster, LLC ("IPOX" or "Plaintiff"), for its Complaint against Defendants Nikko Asset Management Co., Ltd. ("Nikko") and Lazard Asset Management LLC ("Lazard") (collectively "Defendants"), alleges as follows:

## NATURE OF THE ACTION

IPOX created the IPOX® series of Indexes, which are traded in the worldwide financial markets. Based upon the hard work, ingenuity, research and development of IPOX, and its founder Josef Schuster, these Indexes have become the gold standard for all financial instruments that seek to capture the movement of the stocks of both initial public offerings and corporate spin-offs. IPOX now has more than three billion dollars of IPOX-linked products offered since July of 2005.

Therefore, it is no surprise that Nikko and Lazard approached IPOX as they prepared to create their own fund based on U.S. initial public offerings and spin-offs. IPOX gave Lazard a free trial to all of IPOX's confidential information and knowledge with the explicit

understanding that Lazard could not use that data for any purpose other than this initial evaluation unless IPOX received a license. Even while Lazard was promising IPOX that it was using the information for strictly internal assessment and denying that it was launching its own US IPO fund, Lazard was passing the information it gathered from the free trial to Nikko. Nikko and Lazard even went so far as to use IPOX's trademark and trade secret information in their own marketing materials to sell the Nikko fund.

In the end, Nikko and Lazard launched their own fund based upon the misappropriated research, development, expertise, good will, trade secrets and intellectual property of IPOX. Despite repeated demands, even after IPOX learned that Nikko and Lazard had launched their own US IPO fund, Nikko and Lazard have refused to compensate IPOX for taking IPOX's valuable property – denying IPOX fees that it is properly owed.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331, 1338 and 1367.

2.      Venue and personal jurisdiction over the Defendants is appropriate in this judicial district pursuant to 28 U.S.C. § 1391, as Nikko is not resident in the United States and Lazard resides in this judicial district, and a substantial portion of the events giving rise to the claims herein arose in this judicial district. Personal jurisdiction in this judicial district also is appropriate pursuant to 735 ILCS § 5/2-209(c), as Nikko and Lazard have purposefully directed their activities to, and/or purposefully availed themselves of the privilege of conducting business in, Illinois, the claims and injuries herein arise out of the Nikko and Lazard's Illinois-related activities, and the exercise of jurisdiction comports with traditional notions of fair play and substantial justice.

## PARTIES

3.     IPOX is a Delaware limited liability company, registered to do business in Illinois, with a principal place of business in Chicago, Illinois.

4.     Nikko is a corporation organized under the laws of Japan, with a principal place of business in Tokyo, Japan.

5.     Lazard is a Delaware limited liability company, with a principal place of business in New York, New York.

**A.     IPOX and Its IPOX® Global Indexes Products and Services.**

6.     IPOX is an independent, research-driven financial services firm specializing in financial products design related to global initial public stock offerings ("IPOs") and spin-offs. (A "spin-off" is a divestiture by a corporation of a division or subsidiary by issuing to stockholders shares in a new company.) IPOX's underlying philosophy involves classifying IPOs and spin-offs as a separate equity sector for a substantial period of time in aftermarket trading. Its mission is to bring the concept of "Average IPO Investing" and "IPO Indexing" to the global marketplace. IPOX is the first and foremost provider of a comprehensive series of IPO indexes for the global financial marketplace that meet regulatory requirements over a long period of time. These indexes are the product of more than a decade of academic and professional research and expertise on international IPO markets, reflecting the application of methods and standards of judgment developed through the expenditure of substantial intellect, time, effort and money by IPOX and its founder Josef Schuster, and constitute, embody and contain valuable intellectual property and trade secrets of IPOX.

7.     IPOX's main product is the series of IPOX® Indexes, a set of benchmark indexes encompassing a proprietary index technology, confidential data and research developed by IPOX

which allows for scalable, investable and sustainable exposure into global IPO and spin-off performance, often a pure proxy for economic growth and innovation. With more than three billion (US) dollars ($3,000,000,000) worth of IPOX-linked products offered since July of 2005, IPOX has become the benchmark of choice for the buy-and-sell side participants seeking alternative, semi-passive exposure to global growth companies. The IPOX Indexes characterize the aftermarket performance of IPOs and spin-offs more accurately and comprehensively than any other index group.

8.     For over a decade, and long prior to the acts complained of herein, IPOX has used the coined and distinctive term "IPOX" as its trade name, and to identify the services and products – including IPO and spin-off indexes – of IPOX, and to distinguish those products and services from those of others. Since the initial use of its distinctive IPOX name and mark, IPOX has continuously advertised, marketed, distributed, licensed and sold its financial services and products in connection with the IPOX name and mark, in commerce, including in Illinois and this judicial district. As a result, and due to IPOX's extraordinarily-successful track record and expertise, the financial and investment market, and the public in general, have come to know and recognize IPOX's name and mark, and to associate same with IPOX and/or the financial products and services and business of, and/or licensed by, IPOX. IPOX thus has built up extensive goodwill under its IPOX name and mark, and that highly distinctive name and mark have become so well recognized as to be famous, including in this state.

9.     IPOX is the owner of U.S. Trademark Registration No. 3,449,902, for the IPOX mark, issued June 17, 2008. Said registration is valid and subsisting, and pursuant to 15 U.S.C. § 1115(b) operates as conclusive evidence of IPOX's ownership of the IPOX mark, the validity thereof, and IPOX's exclusive right to use same in commerce in connection with the goods and

services set forth in that registration. IPOX is also the owner of Japanese trademark registration no. 474932 for the IPOX mark, issued February 20, 2004.

10. Although certain information and data regarding and comprising, in part, IPOX's IPOX® Indexes are publicly available, significant time-sensitive research, data, and information regarding the IPOX proprietary technology, process, strategy, constituents, trading information, rebalancing, historical data, formulas, methods, processes and/or techniques (hereafter sometimes collectively referred to as the "IPOX Trade Secrets"), are maintained in secret and confidence by IPOX. IPOX permits access to its trademark, confidential and proprietary research, knowledge, technology, methods, information and data pertaining to the IPOX® Indexes via license. IPOX offers two types of licenses (which are typically non-exclusive and non-sublicensable): a "data" license and a "product" license.

11. The IPOX data license is granted typically for the payment of an annual subscription fee, and permits the limited use of the licensed IPOX® Indexes and limits the permissible disclosure of information, charts, data, etc. derived therefrom, for research and advisory purposes only. Importantly, the IPOX data license expressly limits the licensee's ability to create new financial products:

> Notwithstanding anything to the contrary herein, neither Subscriber nor its Authorized Users shall have any right to use any of the IPOX® Custom Indexes or any information related thereto as a component of any product or financial instrument to be developed, marketed and/or promoted by Subscriber, including, without limitation, any indexed fund or structured product based on any of the IPOX Indexes in whole or in part, or to use or refer to any marks owned by IPOX Schuster LLC (including, without limitation, "IPOX®" in connection with the distribution, marketing or promotion of any product or financial instrument). Subscriber agrees and understands that any such use requires a separate license agreement from IPOX Schuster LLC.

12.     The IPOX product license, however, does permit the licensee to use and refer to the designated IPOX® Index(es), for a specified investment product (for example, an exchange trade fund or "ETF") issued or intended to be issued by the licensee. A product license can be substantially more valuable, according the licensee the ability to rely in marketing and managing its financial product to the investing public on the carefully-cultivated reputation and recognition of, and goodwill in, the IPOX® name, mark and Indexes, as well as the proprietary index technology, confidential data and research developed by IPOX. IPOX product licenses typically are granted for a fee derived from multiplying a specified number of basis points (for example, 1 basis point equals 0.01%) of the aggregate daily amount invested in the licensed product, to be paid quarterly, for the life of the product/license term. Over fifty (50) such licensed products have been launched, covering all world regions, with a value of over $3 billion.

**B.      Defendants' Unauthorized Use of the IPOX® Research, Development, Expertise, Goodwill and Mark to Market, Develop and Launch the Nikko U.S. Growing Venture Fund.**

13.     On August 6, 2014, Erik Miller of Lazard sent an email to IPOX, seeking information that Mr. Miller indicated he could not find on the IPOX web site, regarding the "methodology used to comprise the [IPOX®] index." Josef Schuster, founder and Chief Executive Officer of IPOX, responded to Mr. Miller of Lazard with some general information and the IPOX® Indexes Rulebook.

14.     On August 18, 2014, Ronald Cajetan, of Nikko's Information Technology Division, contacted IPOX, seeking "to subscribe to IPOX 100 composite index going as far back as December 1999." Mr. Schuster responded, identifying the two types of licenses in the IPOX® Indexes it offered, data and product licenses, the pricing and the particular uses of each. Mr. Cajetan of Nikko then asked "who owns IPOX US 100," and further advised "[w]e may have

product linked to the IPOX 100 US but we are still accessing [sic] the possibility." Mr. Schuster replied that IPOX "owns all the IP, including trademarks, patents, etc." and that the IPOX® Indexes are "the main revenue generator" for IPOX. No mention or indication of any association between Lazard and Nikko was made.

15.    On or about August 21, 2014, Mr. Cajetan contacted Mr. Schuster informing him that Nikko "wants to be licensed" and sought a price quotation. On September 4, 2014, Mr. Schuster responded to Mr. Cajetan's request with an email attaching an IPOX data license agreement.

16.    During further email communications between Mr. Cajetan and Mr. Schuster regarding the data only license, Mr. Cajetan represented that, notwithstanding his earlier statement, Nikko was not intending to launch an IPOX-linked fund product, but rather sought the IPOX® Indexes license for research purposes only. According to Mr. Cajetan, Nikko was only interested in "the general movement of US IPO Indices".

17.    On September 5, 2014, less than one day after IPOX sent the IPOX data license to Nikko, Minoru Kosaka of Lazard contacted IPOX again seeking information about the IPOX® Indexes. Mr. Schuster provided Mr. Kosaka with information about the IPOX® Indexes by September 5, 2014, email reply, and thereafter followed further email and telephone communications between Mr. Schuster and Michael Krenn, a Senior Vice President of Lazard in the New York office.

18.    On September 9, 2014, Lazard requested, and IPOX agreed, to provide Lazard a one-month free trial data license to the IPOX 100 US Index. In agreeing to the free trial, IPOX expressly advised Lazard via a September 9, 2014, email "that a license is required, should you be interested in using the index etc. for a product."

19.     Between September 16 and September 24, 2014, during the term of Lazard's free trial, Lazard's Minoru Kosaka and Shintaro Kambara, of which Mr. Kosaka was among the Lazard personnel granted access to the IPOX confidential and trade secret information, sought intricate technical, nonpublic information from Mr. Schuster about the IPOX® Indexes (including the methods of creating the IPOX 100 US Index,  historical constituents, historical valuations and historical performance). In the course of these communications, Mr. Schuster repeatedly inquired what the commercial relationship between Lazard and IPOX would be; for example, on September 24, 2014, just one week before the actual launch of the Nikko Fund, Mr. Kambara represented that Lazard was not going "to launch a IPO fund now," but was "conducting due diligence of relevant IPO Index," that he had "heard that you and Lazard Index team are discussing now," that Mr. Schuster's "support during trial term must be great help for us to recommend your index to our index team," and that Lazard and IPOX would be able to "work together." Based on the express representations and understanding that the information would be used solely for the evaluation of the IPOX products and not for launching a fund for commercially exploiting the product, IPOX provided certain research, development and expertise in addition to the IPOX Trade Secrets to Lazard, many of which were not generally known to others, and which Lazard knew or had reason to know comprised the confidential information and/or trade secrets of IPOX.

20.     On October 1, 2014, Nikko launched a financial product called the Nikko US Growing Venture Fund (hereafter, the "Nikko Fund"). The investment advisor or manager of the Nikko Fund was Lazard. Marketing material for the Nikko Fund – available to potential U.S. investors via, *inter alia*, the Internet – prominently displayed the IPOX® trademark, made reference to and relied upon the reputation of, and goodwill in, the IPOX® name, mark and

business, and the performance history of an IPOX® Index (the IPOX 100 US Index), as well as proprietary charts, data and information, including confidential information, of IPOX. In fact, following the launch of the Nikko Fund, there has been substantial overlap between the securities and percentage holdings between the IPOX 100 US Index and the Nikko Fund. In addition, since launch, the Nikko Fund and the IPOX 100 US Index have also traded at a statistically significant correlation versus each other. Although, as set forth in more detail below, IPOX had been communicating with both Nikko and Lazard separately for nearly two months regarding the IPOX® Indexes and licenses, prior to the launch date of the Nikko Fund, IPOX was completely unaware of the Nikko Fund or Nikko and Lazard's plans, jointly, to launch, market and manage same using the IPOX® Indexes name, reputation, proprietary information, and track record.

21. On October 2, 2014, the day after the Nikko Fund launched and with no mention of same, Mr. Kosaka of Lazard told Mr. Schuster to once again contact Mr. Krenn of Lazard who is "responsible for managing all indices that our firm uses." Despite Lazard's assurances that it was not going to use IPOX's confidential information for a fund, the frequency and content of the questions to Mr. Schuster led him (as he so advised Mr. Krenn) to "assume the [IPOX 100 US] index, constituents, methodology, etc. to be an integral part of the product." Therefore, on October 5, 2014, at the request of Mr. Krenn, Mr. Schuster sent Mr. Krenn a product license agreement that would allow Lazard use of the IPOX data to create its own fund, because Mr. Schuster "believe[d] that the index will be used in the context of a fund (full-or partial index replication branded or non-branded index replication)". In a follow-up email message on or about October 10, 2014, Mr. Krenn responded to IPOX® that "[t]he index will not be used in the context of a portfolio, i.e. it is not the benchmark by which performance will be measured. The team has only requested constituent data vie [sic] Bloomberg for Risk Management purposes."

Mr. Schuster then forwarded a data only license to Mr. Krenn, who indicated he had sent the license to "legal" to revise the permitted number of licensees. Lazard never executed that license agreement.

**C.      IPOX Learns About the Launch of the Nikko Fund.**

22.      On or about October 16, 2014, IPOX learned of the launch of the Nikko Fund and the promotional materials published and available on the Internet, using the IPOX® name, mark, reputation, track record, research, development expertise and goodwill and divulging IPOX Trade Secrets, including charts, data and information. Neither Lazard nor Nikko had received either a product or data license to use any of IPOX's trademarks, trade secrets, confidential information, research, knowledge or goodwill.

23.      Notwithstanding this, Nikko and Lazard continued to use the IPOX® name and mark, and IPOX Trade Secrets and materials derived from IPOX to manage, market, promote and solicit investors to, the Nikko Fund.

24.      The Nikko Fund is a "closed-end" fund – that is, a fixed amount of capital was raised through the Fund's initial offering. This amount was in excess of $441 million dollars ($441,000,000.00). The research, development and knowledge of IPOX, the recognition and goodwill of the IPOX® trademark and name, and the success, renown and track record of the IPOX® Indexes directly contributed to, if not enabled, the ability of Nikko and Lazard and their Fund, with no track record whatsoever in the US IPO and spin-off fund market, to secure this enormous initial capitalization. Thus, Nikko and Lazard continue to derive substantial benefit from their unauthorized use of IPOX's research, development, knowledge and goodwill, the IPOX® trademark, its Indexes and Trade Secrets, whether or not such usage has ceased.

## FIRST CLAIM FOR RELIEF

(Misappropriation under Illinois Common Law)

25.    Plaintiff restates and realleges ¶¶ 1 through 24, above, and hereby incorporates same as if fully set forth herein.

26.    Plaintiff has a proprietary interest in its IPOX® Indexes, research, development, expertise and goodwill, which are created at a cost and expense to IPOX and vests it with the exclusive right to license their use for trading in financial products, and which are the valuable assets of Plaintiff. The value of this proprietary interest is time sensitive.

27.    Defendants have created a competing fund and have used and exploited Plaintiff's IPOX® Indexes, and Plaintiff's track record, good will, and its reputation for integrity and accuracy in connection with the IPOX® Indexes, as well as the research and development, skills, labor, and necessary expenditures of Plaintiff used to create the IPOX® Indexes, without compensation to, or license by, Plaintiff and have thus harmed Plaintiff.

28.    By reason of their acts as aforesaid, Defendants have committed misappropriation under Illinois common law.

29.    Plaintiff has suffered and will continue to suffer irreparable harm and damage as a result of Defendants' misappropriation, in an amount not yet ascertainable, entitling Plaintiff to injunctive relief, to recover its actual damages, including Defendants' unjust enrichment, and/or a reasonable royalty, and other relief in an amount to be proven at trial.

## SECOND CLAIM FOR RELIEF

(Misappropriation under the Illinois Trade Secrets Act)

30.    Plaintiff restates and realleges ¶¶ 1 through 24, above, and hereby incorporates same as if fully set forth herein.

31.    Defendants disclosed and/or used without consent, IPOX Trade Secrets acquired from Plaintiff by misrepresentation, breach or inducement of a breach of confidential relationship with Plaintiff and/or other duty to maintain the secrecy and/or to limit the use of, the IPOX Trade Secrets, or other improper means, knowing and/or having reason to know that such Trade Secrets were acquired by improper means, and/or under circumstances giving rise to a duty to maintain their secrecy or limit their use.

32.    By reason of their acts as aforesaid, Defendants have committed misappropriation under 765 Ill. Comp. Stat § 1065/2.

33.    Plaintiff has suffered and will continue to suffer irreparable harm and damage as a result of Defendants' misappropriation, in an amount not yet ascertainable, entitling Plaintiff to injunctive relief, to recover its actual damages, including Defendants' unjust enrichment, and/or a reasonable royalty, and other relief under 765 Ill. Comp. Stat §1065/3 and § 1065/4 in an amount to be proven at trial.

34.    Defendants' misappropriation is willful and malicious, entitling Plaintiff to recover exemplary damages of two times the award made to Plaintiff, as well as attorneys' fees as provided for under 765 Ill. Comp. Stat §1065/4.

35.    Defendants will continue in their misappropriation, unless enjoined by this Court.

**THIRD CLAIM FOR RELIEF**

(Trademark Infringement under the Lanham Act
and Illinois Common Law)

36.    Plaintiff restates and realleges ¶¶ 1 through 24, above, and hereby incorporates same as if fully set forth herein.

37.    Defendants have used Plaintiff's federally registered IPOX® mark in commerce and have applied said registered mark to advertising intended to be used in commerce, in

12

connection with the sale, offering for sale, distribution, or advertising of goods and/or services, which such use is likely to cause confusion, or to cause mistake, or to deceive, with respect to Plaintiff, its business, and/or the goods and/or services advertised, marketed, offered, licensed and/or sold by or on behalf of Plaintiff.

38.    Defendants' use of Plaintiff's registered IPOX® mark was without the consent of Plaintiff.

39.    By reason of their acts, Defendants have committed trademark infringement under 15 U.S.C. § 1114 and Illinois common law.

40.    Defendants had actual knowledge of Plaintiff's registered IPOX® mark and Plaintiff's exclusive rights in that mark, and further, Defendants' infringement was knowing and/or willful.

41.    Plaintiff has suffered and will continue to suffer irreparable harm and damage as a result of Defendants' willful trade dress infringement, in an amount not yet ascertainable, entitling Plaintiff to injunctive relief, to recover its actual damages, including Defendants' profits, and other relief under 15 U.S.C. §§ 1116 and 1117 and Illinois common law in an amount to be proven at trial.

42.    Defendants' acts render this an exceptional case and entitle Plaintiff to recover three times the amount of Plaintiff's actual damages including Defendants' profits, as well as attorneys' fees as provided for under 15 U.S.C. § 1117 and Illinois common law.

43.    Defendants will continue in their trademark infringement, unless enjoined by this Court.

## FOURTH CLAIM FOR RELIEF

(False Designation of Origin and False
Advertising under the Lanham Act)

44.     Plaintiff restates and realleges ¶¶ 1 through 24, above, and hereby incorporates same as if fully set forth herein.

45.     Defendants have used Plaintiff's IPOX® mark in commerce and in commercial advertising in a manner which falsely designates the origin of Defendants' products and/or services, and/or which falsely and/or misleadingly represents or suggests that Defendants' goods and/or services have characteristics and/or qualities which they do not have.

46.     The use by Defendants in commerce of a false and/or misleading description or representation, and/or false designation of origin, is likely to cause confusion, mistake, or to deceive as to the origin, sponsorship and/or approval of the goods, services or commercial activities of Defendants, and further to misrepresent the characteristics and/or qualities of the goods, services and/or commercial activities of Defendants.

47.     By reason of their acts, Defendants have committed false designation of origin, false description and/or representation, and false advertising under 15 U.S.C. § 1125(a).

48.     Plaintiff has suffered and will continue to suffer irreparable harm and damage as a result of Defendants' false designation of origin, false description and/or representation, and false advertising, in an amount not yet ascertainable, entitling Plaintiff to injunctive relief, to recover its actual damages, including Defendants' profits, and other relief under 15 U.S.C. §§ 1116 and 1117 in an amount to be proven at trial.

49.     Defendants' acts render this an exceptional case and entitle Plaintiff to recover three times the amount of Plaintiff's actual damages including Defendants' profits, as well as attorneys' fees as provided for under 15 U.S.C. § 1117.

50. Defendants will continue in their false designation of origin, false description and/or representation, and false advertising, unless enjoined by this Court.

### FIFTH CLAIM FOR RELIEF

(Deceptive Trade Practices under the Illinois
Uniform Deceptive Trade Practices Act)

51. Plaintiff restates and realleges ¶¶ 1 through 24, above, and hereby incorporates same as if fully set forth herein.

52. Defendants, by reason of their acts of trademark infringement and false designation of origin, false description and/or representation, and false advertising, have committed deceptive trade practices, under the Illinois Uniform Deceptive Trade Practices Act, 815 Ill.Comp.Stat. § 510/2 by causing confusion or misunderstanding as to the source, sponsorship or approval of Defendants' fund.

53. Defendants' deceptive trade practices and violations of 815 Ill.Comp.Stat. § 510/2 were willful.

54. Plaintiff has suffered and will continue to suffer irreparable harm and damage as a result of Defendants' deceptive trade practices in an amount not yet ascertainable, to be proven at trial, entitling Plaintiff to injunctive relief, attorneys' fees and costs, under 815 Ill.Comp.Stat. § 510/3.

### SIXTH CLAIM FOR RELIEF

(Dilution under the Illinois Trademark Registration and
Protections Act, and Illinois common law)

55. Plaintiff restates and realleges ¶¶ 1 through 24, above, and hereby incorporates same as if fully set forth herein.

56.   Plaintiff's IPOX® mark is, and since prior to the acts Defendants complained of herein, has been distinctive and famous, including in the state of Illinois.

57.   Defendants have used Plaintiff's IPOX ® trademark willfully intending to trade off of the reputation of said mark, and in a manner which has had the effect of lessening the capacity of Plaintiff's IPOX® mark to identify and/or distinguish Plaintiff's goods, services, commercial activities and/or business, and/or which has caused dilution of the distinctive quality and/or tarnishment of Plaintiff's IPOX® mark and name, in violation of 765 Ill. Comp. Stat. § 1036/65(a) and Illinois common law.

58.   Plaintiff has suffered and will continue to suffer irreparable harm and damage as a result of Defendants' dilution of Plaintiff's IPOX® mark, entitling Plaintiff to injunctive relief under 765 Ill. Comp. Stat. § 1036/65(a), and to recover Plaintiff's actual damages and other relief under Illinois common law in an amount to be proven at trial.

59.   Defendants will continue in their dilution unless enjoined by this Court.

## SEVENTH CLAM FOR RELIEF

### (Fraud)

60.   Plaintiff restates and realleges ¶¶ 1 through 24, above, and hereby incorporates same as if fully set forth herein.

61.   Defendant Lazard made false statements of material fact and representations that their requests for detailed and confidential information regarding, and the IPOX® Indexes and Trade Secrets, and free trial IPOX® data license, was for research and/or "risk management" purposes only, that Defendants were not going to "launch a IPO fund now," that the IPOX® Index "will not be used in the context of a portfolio"; that such information and access was sought for purposes of "conducting due diligence"; that Plaintiff's "support during trial term

must be great help for us to recommend your index to our index team", and that Lazard and IPOX would be able to "work together"; and further, that Defendant Lazard was seeking the access to and information regarding the IPOX® Indexes and Trade Secrets in furtherance of obtaining a license from Plaintiff.

62.    Each of the statements and representations set forth in ¶61, above, was false and Defendant Lazard knew them to be false when made.

63.    Defendant Lazard knowingly made the false statements as aforesaid to induce Plaintiff to provide access to and information from the IPOX® Indexes and Trade Secrets, and Plaintiff relied on such false statements.

64.    By reason of their acts as aforesaid, Defendant Lazard has committed fraud under Illinois common law.

65.     Plaintiff has suffered and will continue to suffer irreparable harm and damage as a result of Defendant Lazard's fraud, entitling Plaintiff to an amount commensurate with the benefit received and retained by Defendant Lazard, in an amount to be proven at trial, as well as punitive damages and attorneys' fees and costs.

**EIGHTH CLAIM FOR RELIEF**

(Unfair Business Practices and Unfair Competition under the
Consumer Fraud and Deceptive Business Practices Act)

66.    Plaintiff restates and realleges ¶¶ 1 through 24, above, and hereby incorporates same as if fully set forth herein.

67.    Defendant Lazard has used and/or employed deception, fraud, false pretense, false promise, misrepresentation, concealment, suppression and/or the omission of material facts with the intention that Plaintiff rely on such concealment, suppression and/or omission of material fact in the conduct of trade and/or commerce.

68. By reason of Defendant Lazard's acts and by reason of their trademark infringement, false designation of origin and false advertising, deceptive trade practices under the Illinois Uniform Deceptive Trade Practices Act, dilution, misappropriation, unjust enrichment, tortious interference, and fraud, have committed unfair competition and unfair business practices under 815 Ill.Comp.Stat. § 505/2 and Illinois common law.

69. Plaintiff has suffered and will continue to suffer irreparable harm and damage as a result of Defendant Lazard's unfair competition and unfair business practices, in an amount not yet ascertainable, entitling Plaintiff to injunctive relief, to recover its actual damages, and other relief under 815 Ill.Comp.Stat. § 505/10a.

70. Defendant Lazard's acts were willful and/or undertaken with malice, entitling Plaintiff to recover three times the amount of Plaintiff's actual damages, in an amount to be proven at trial, as well as attorneys' fees as provided for under 815 Ill.Comp.Stat. § 505/10a.

71. Defendant Lazard will continue in their unfair competition and unfair business practices unless enjoined by this Court.

## NINTH CLAIM FOR RELIEF

(Breach of Contract) (In the Alternative)

In the alternative to Claims I through VIII above, Plaintiff claims as follows:

72. Plaintiff restates and realleges ¶¶ 1 through 24, above, and hereby incorporates same as if fully set forth herein.

73. Following IPOX's discovery of the launch of the Nikko Fund by Defendants, Mr. Schuster offered a settlement to cure the past infringement of IPOX's rights and to provide Defendants a license for the future use of those rights. On October 16, 2014, Mr. Schuster of IPOX contacted Mr. Cajetan of Nikko, and the next day, emailed a product license agreement to Mr. Cajetan. Following further discussions, including Mr. Cajetan's admission of IPOX's

"product license infringement by us [Nikko]," on about October 27, 2014, Mr. Cajetan sent a marked-up version of the IPOX product license, with Nikko's proposed changes, to IPOX including agreeing to pay IPOX 8 (eight) basis points p.a. (8bps or 0.08% p.a.) per year of the average aggregate daily amount invested in Nikko's newly launched Nikko Fund. After Mr. Schuster confirmed to Mr. Cajetan that IPOX had accepted all of Nikko's proposed changes to the product license agreement, in emails of October 28, 2014, Mr. Cajetan directed Mr. Schuster to send the executed product license agreement to Mr. Cajetan, by mail, with a copy via email. On October 29, 2014, Mr. Schuster did this.

74.  Shortly thereafter, however, Mr. Cajetan advised Mr. Schuster that Nikko would not enter into the license agreement.

75.  At first, Mr. Cajetan asserted that, "Lazard Asset Management is entrusted with the operation of the fund and we believe that they have already paid for the fees for the IOPX[sic]." Defendant Lazard, too, contacted IPOX and claimed that it was licensed to use the IPOX® Indexes, but then acknowledged that was not the case.

76.  During these communications, Defendant Nikko repeatedly admitted to Nikko's "past, current, and ongoing usage beginning from October 2014 to January 31, 2015" of the "IPOX related brand features and data."

77.  On or about October 28, 2014, Defendant Nikko entered into an IPOX® product license with Plaintiff, which product license is valid and enforceable.

78.  Defendant Nikko has received and continues to receive the benefit of, and consideration from, Plaintiff for the IPOX® product license, and Plaintiff remains ready, willing and able to perform its obligations under the IPOX® product license, but Defendant Nikko has not paid, and refuses to pay, the license fee required pursuant to the license.

79.    By reason of its acts as aforesaid, and as set forth in ¶¶ 1 through 24 and 73 through 78, above, of this Complaint, Defendant Nikko has breached the IPOX® product license.

80.    Plaintiff has been damaged by Defendant Nikko's breach of contract in an amount to be proven at trial.

81.    Plaintiff is entitled to specific performance by Defendant Nikko under the IPOX® product license.

## TENTH CLAIM FOR RELIEF

### (Breach of Implied Contract- against Nikko) (In the Alternative)

In the alternative to Claims I through IX above, Plaintiff claims as follows:

82.    Plaintiff restates and realleges ¶¶ 22 through 24; 73 through 76; and 78, above, and hereby incorporates same as if fully set forth herein.

83.    In the alternative, if Nikko did not have an express contract with Plaintiff with respect to the IPOX® Index proprietary technology, confidential data and research, and IPOX Trade Secrets, then Nikko, by reason of its acts, conduct and representations, agreed to pay the license fees and otherwise abide by the terms of Plaintiff's IPOX® product and data licenses, creating an implied in fact contract with Plaintiff.

84.    By reason of its acts as set forth in ¶¶ 22 through 24; 73 through 76; and 78 above of this Complaint, Defendant Nikko has breached the implied contract in fact with Plaintiff.

85.    Plaintiff has been damaged by Nikko's breach of implied contract, in an amount to be proven at trial.

## ELEVENTH CLAIM FOR RELIEF

### (Breach of Implied Contract - against Lazard) (In the Alternative)

In the alternative to Claims I through IX above, Plaintiff claims as follows:

86.   Plaintiff restates and realleges ¶¶ 1 through 24, above, and hereby incorporates same as if fully set forth herein.

87.   In the alternative, if Lazard did not have an express contract with Plaintiff with respect to the IPOX® Index proprietary technology, confidential data and research, and IPOX Trade Secrets, then Lazard, by reason of its acts, conduct and representations, agreed to pay the license fees and otherwise abide by the terms of Plaintiff's IPOX® product and data licenses, creating an implied in fact contract with Plaintiff

88.   By reason of its acts as set forth in ¶¶ 22 through 24 above of this Complaint, Defendant Lazard has breached the implied contract in fact with Plaintiff.

89.   Plaintiff has been damaged by Lazard's breach of implied contract, in an amount to be proven at trial.

## TWELTH CLAIM FOR RELIEF

### (Unjust Enrichment) (In the Alternative)

In the alternative to Claims I through XI above, Plaintiff claims as follows:

90.   Plaintiff restates and realleges ¶¶ 1 through 24, above, and hereby incorporates same as if fully set forth herein.

91.   Defendants have unjustly retained the benefit of Plaintiff's IPOX® Indexes, the IPOX Trade Secrets, and Plaintiff's track record, good will, and its reputation for integrity and accuracy in connection with the IPOX® Indexes, as well as the research and development, skills, labor, and necessary expenditures of Plaintiff used to create the IPOX® Indexes to the benefit of Defendants, and the retention of said benefit by Defendants violates fundamental principles of justice, equity, and good conscience.

92.    By reason of their acts as aforesaid, Defendants have committed unjust enrichment under Illinois common law.

93.    Plaintiff has suffered and will continue to suffer irreparable harm and damage as a result of Defendants' unjust enrichment, entitling Plaintiff to an amount commensurate with the benefit received and retained by Defendants in an amount to be proven at trial.

### THIRTEENTH CLAIM FOR RELIEF

(Tortious Interference with Contract by Defendant Lazard)

In the alternative to Claims I through XII above, Plaintiff claims as follows:

94.    Plaintiff restates and realleges ¶¶ 1 through 24 and 73 through 78, above, and hereby incorporates same as if fully set forth herein.

95.    Plaintiff and Defendant Nikko entered into a valid, enforceable contract/IPOX® license. Plaintiff and Defendant Nikko negotiated to the terms of a product license. In a written communication, Defendant Nikko agreed to the terms of the revised agreement and asked Plaintiff to transmit a signed copy and Plaintiff transmitted such a signed copy to Defendant Nikko.

96.    Defendant Lazard was aware of the contractual relationship between Plaintiff and Defendant Nikko.

97.    Defendant Lazard maliciously and without justification, induced Defendant Nikko to breach its contract with Plaintiff, and Defendant Nikko did subsequently breach that contract stating that it did not need a contract with Plaintiff because Defendant Lazard had already entered into a license with Plaintiff.

98.    By reason of its acts as aforesaid, Defendant Lazard has tortuously interfered with contract under Illinois common law.

99.   Plaintiff has suffered and will continue to suffer irreparable harm and damage as a result of Defendants' tortious interference, entitling Plaintiff to damages in an amount as yet not ascertainable, to be proven at trial.

### FOURTEENTH CLAIM FOR RELIEF

(Tortious Interference with Prospective
Business Advantage by Defendant Lazard)

In the alternative to Claims I through XIII above, Plaintiff claims as follows:

100.   Plaintiff restates and realleges ¶¶ 1 through 24 and 73 through 78, above, and hereby incorporates same as if fully set forth herein.

101.   In the alternative, and to the extent that Plaintiff and Defendant Nikko did not enter into a valid and enforceable agreement, Plaintiff had a reasonable expectancy of entering into a valid business relationship with Defendant Nikko. Plaintiff and Defendant Nikko negotiated the terms of a product license.  In a written communication, Defendant Nikko agreed to the terms of the revised agreement and asked Plaintiff to transmit a signed copy and Plaintiff transmitted such a signed copy to Nikko. Defendant Lazard had knowledge of such expectancy.

102. Defendant Lazard intentionally, and without justification, interfered with the prospective business relationship between Plaintiff and Defendant Nikko, inducing and/or causing Defendant Nikko to terminate and/or breach its business relationship and/or prospective business relationship with Plaintiff. Defendant Nikko subsequently refused to sign that contract stating that it did not need a contract with Plaintiff because Defendant Lazard had already entered into a license with Plaintiff.

103. By reason of its acts as aforesaid, Defendant Lazard has tortuously interfered with prospective business advantage under Illinois common law.

104. Plaintiff has suffered and will continue to suffer irreparable harm and damage as a result of Defendants' tortious interference, entitling Plaintiff to damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, IPOX Schuster, LLC, respectfully prays this Court:

To enter judgment in Plaintiff's favor and against Defendants Nikko Asset Management Co., Ltd. and Lazard Asset Management LLC as follows:

1. issuing a preliminary and permanent injunction enjoining Defendants, and each of its officers, directors, agents, servants, employees, and representatives, and all those acting in concert or participation with Defendants who receive actual notice, from continuing to use Plaintiff's research, development, expertise, goodwill, trade secrets and trademarks in connection with the operation and marketing of the Nikko Fund;

2. awarding Plaintiff compensatory damages in an amount to be proven at trial;

3. awarding Plaintiff punitive or exemplary damages in an amount to be proven at trial;

4. awarding Plaintiff its reasonable attorneys' fees and costs; and

5. in the alternative, entering an order requiring Defendant Nikko to specifically perform under the IPOX® product license; and/or damages under the license agreement, including prejudgment interest; and

6. granting such further relief as the Court deems just and appropriate.

## JURY DEMAND

Plaintiff demands trial by jury.

Dated: November 4, 2015

By: /s/ Patrick T. Stanton
　　　One of the Attorneys for Plaintiff

Patrick T. Stanton (No. 6216899)
Aaron D. Charfoos (No. 6277242)
Kara B. Murphy (No. 6309748)
Dykema Gossett PLLC
10 S. Wacker Drive
Suite 2300
Chicago, IL  60606
Telephone:  (312) 876-1700
Facsimile:  (312) 876-1155

Marsha G. Gentner (*pro hac vice* forthcoming)
Dykema Gossett PLLC
Franklin Square Building
1300 I Street N.W.
Suite 300 West
Washington, D.C. 20005
Telephone:  (202) 906-8600