**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **IPOX SCHUSTER, LLC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 15 C 9955** |
| | ) | |
| **NIKKO ASSET MANAGEMENT** | ) | |
| **CO., LTD. and LAZARD ASSET** | ) | |
| **MANAGEMENT LLC,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

IPOX Schuster, LLC, has sued Nikko Asset Management Co., Ltd., and Lazard

Asset Management LLC alleging that defendants misappropriated proprietary and

confidential information and violated IPOX's trademark rights. IPOX claims that

defendants committed unlawful misappropriation under Illinois common law (count 1)

and the Illinois Trade Secrets Act (ITSA), 765 ILCS 1065/2 (count 2), infringed IPOX's

trademark in violation of Illinois common law and the Lanham Act, 15 U.S.C. § 1114

(count 3), and violated the Lanham Act's prohibitions on false designations of origin and

false advertising, *id.* § 1125(a) (count 4). IPOX further asserts that defendants violated

the Illinois Deceptive Trade Practices Act (IDTPA), 815 ILCS 510/2 (count 5), and

trademark dilution under the Illinois Trademark Registration Protections Act (ITRPA),

765 ILCS 1036/65(a), and Illinois common law (count 6). IPOX also asserts against

Lazard claims of fraud (count 7) and unfair business practices and unfair competition

under the Illinois Consumer Fraud and Deceptive Business Practices Act (ICFA), 815 ILCS 505/2, and Illinois common law (count 8).  In the alternative, IPOX asserts a breach of contract claim against Nikko (count 9), breach of implied contract claims against Nikko (count 10) and Lazard (count 11), an unjust enrichment claim against both defendants (count 12), and tortious interference claims against Lazard (counts 13 and 14).

Nikko has moved to dismiss IPOX's claims against it on two bases.  First, it moves to dismiss for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2).  Second, it argues that IPOX has failed to state a claim under Rule 12(b)(6). For the reasons stated below, the Court dismisses count 4 for failure to state a claim but otherwise denies Nikko's motion.

## Background

The Court takes the following facts from the allegations in IPOX's complaint and the evidence adduced in jurisdictional discovery.  IPOX, a Delaware limited liability company with its principal place of business in Chicago, is a financial services firm.  Its main product is a set of benchmark indexes that, using proprietary technology and confidential research and data, provides "scalable, investable and sustainable exposure into global IPO and spin-off performance, often a pure proxy for economic growth and innovation."  Compl., dkt. no. 1, ¶ 7.  IPOX owns the trademark for the IPOX mark in the United States, U.S. Trademark Registration No. 3,449,902, and it also owns the Japanese trademark for the IPOX mark, no. 474932.

Because IPOX's indexes "characterize the aftermarket performance of IPOs and spin-offs more accurately and comprehensively" than other indexes, *id.*, investors

regularly seek to obtain licenses to gain access to them. IPOX offers "data" licenses and "product" licenses. Under a data license, a licensee is granted limited use of licensed IPOX indexes (and the information, charts, and data derived from them) for research and advisory purposes only. Data licenses expressly disallow licensees to create new financial products using the indexes or the information they provide. IPOX grants data licenses in exchange for annual subscription fees.

If a person wishes to create a financial product using IPOX's indexes, she must secure a product license. IPOX product licenses permit licensees to display the IPOX name and benefit from "the carefully-cultivated reputation and recognition of, and goodwill in, the IPOX name, mark and Indexes, as well as the proprietary index technology, confidential data and research developed by IPOX." *Id.* ¶ 12. Product licenses are more lucrative for IPOX because rather than requiring an annual subscription, IPOX typically grants a product license for a variable fee based on the amount of money invested daily in the licensed product.

In early August 2014, IPOX received an email from a representative of Lazard, a Delaware limited liability company whose principal place of business is New York City. Lazard wished to know the methodology used to develop the IPOX indexes. Josef Schuster, IPOX's founder and CEO, responded to the email and provided Lazard general information. Nikko, a Japanese corporation with its principal place of business in Japan, contacted IPOX less than two weeks later in the hope of "subscrib[ing] to" the IPOX 100 US Index. Schuster responded to this inquiry as well, providing Nikko with information about its two types of licenses, their prices, and how they could be used. Nikko informed IPOX that it was interested in developing a product that would use this

IPOX index but that it had not yet determined whether it would do so and was curious about who owned the index. IPOX responded that it owned all of its intellectual property including trademarks and patents and that licensing the indexes was its primary means of generating revenue. In late August 2014, Nikko notified IPOX that it wished to procure a data license. It did not indicate that it intended to launch a product using the IPOX 100 US Index; rather, it indicated that it was interested in monitoring the movement of IPO indexes in the United States. IPOX sent a data license agreement to Nikko on September 4, 2014, but Nikko never executed the agreement.

The next day, Lazard contacted IPOX to request more information about the IPOX indexes. This began a dialogue between the two companies that culminated in Lazard requesting a one-month free trial data license to the IPOX 100 US Index. IPOX agreed to grant Lazard a free trial but notified Lazard that if it decided it wanted to use the index to launch a product, it would need to purchase a product license. During Lazard's free trial, Lazard personnel continued to exchange phone calls and emails with IPOX representatives to inquire about the methods used to create the index and its historical constituents, valuations, and performance. Lazard continued to represent to IPOX that it did not intend to use IPOX's index to launch an investment fund but rather wanted to use the index for research purposes.

According to IPOX, Lazard made "express representations" and agreed that the information IPOX shared with it "would be used solely for the evaluation of the IPOX products and not for launching a fund for commercially exploiting the product." *Id.* ¶ 19. IPOX claims that in reliance on these representations, it "provided certain research, development and expertise in addition to . . . IPOX Trade Secrets to Lazard, many of

which were not generally known to others, and which Lazard knew or had reason to know comprised the confidential information and/or trade secrets of IPOX." *Id.* IPOX described these trade secrets as "significant time-sensitive research, data, and information regarding the IPOX proprietary technology, process, strategy, constituents, trading information, rebalancing, historical data, formulas, methods, processes and/or techniques" that "are maintained in secret and confidence by IPOX." *Id.* ¶ 10.

On October 1, 2014, Nikko launched a financial product called the Nikko US Growing Venture Fund. Pursuant to an investment management agreement, Nikko contracted with Lazard to serve as the fund's investment advisor or manager. IPOX alleges that "[m]arketing material for the Nikko Fund—available to potential U.S. investors via, *inter alia*, the Internet—prominently displayed the IPOX® trademark" and "made reference to and relied upon the reputation of, and goodwill in, the IPOX® name, mark and business, and the performance history" of the IPOX 100 US index and proprietary materials and information belonging to IPOX. *Id.* ¶ 20. After the fund's launch but before IPOX was aware of the fund's existence, Lazard continued to ask IPOX questions about its index that suggested to IPOX that Lazard intended to use the index to launch a product. IPOX sent Lazard a product license agreement to sign so that Lazard could, for good consideration, permissibly use the index to launch a fund. Lazard responded that it would not use the IPOX index for any product. IPOX then sent Lazard a data license agreement, but Lazard never executed it.

About two weeks later, IPOX learned that Nikko had launched the fund. IPOX alleges that it also learned Nikko had published promotional materials available on the Internet that used the IPOX "name, mark, reputation, track record, research,

development expertise and goodwill" and divulged "IPOX Trade Secrets, including charges, data and information." *Id.* ¶ 22. The fund bore characteristics that indicated to IPOX that the fund utilized the IPOX 100 US index, despite IPOX's repeated admonitions that Nikko could not use the index to launch a product unless it purchased a product license. On October 16, 2014, IPOX sent a cease-and-desist letter to Nikko. The next day, IPOX emailed a product license agreement to Nikko. Nikko and IPOX exchanged emails in which they proposed edits and revisions to the product license agreement, negotiated terms, and discussed the parameters of a potential product license. After both sides had made changes to the product license agreement, IPOX signed and sent the agreement by mail to Nikko. Shortly thereafter, however, Nikko informed IPOX that it would not sign the license agreement.

Neither Lazard nor Nikko ever paid for a product license to use the IPOX index for the fund. IPOX alleges that by the unauthorized use of its "research, development and knowledge . . . the recognition and goodwill of the IPOX® trademark and name and the success, renown and track record of the IPOX® Indexes," defendants raised over $441 million in capital for the fund's initial offering. *Id.* ¶ 24.

IPOX sued Lazard and Nikko in November 2015 asserting fourteen claims for relief. Against both defendants, IPOX asserted claims of misappropriation under Illinois common law (count 1) and the ITSA (count 2), trademark infringement under the Lanham Act and Illinois common law (count 3), false designation of origin and false advertising under the Lanham Act (count 4), deceptive trade practices under the IDTPA (count 5), and dilution under the ITRPA and Illinois common law (count 6). Against Lazard alone, IPOX asserted claims of fraud under Illinois common law (count 7) and

unfair business practices and unfair competition under the ICFA (count 8). In the alternative, IPOX asserted a breach of contract claim against Nikko (count 9) and breach of implied contract claims against Nikko (count 10) and Lazard (count 11). It also pleaded a common law unjust enrichment claim in the alternative against both defendants (count 12) and tortious interference claims against Lazard (counts 13 and 14).

**Discussion**

Nikko has filed an omnibus motion to dismiss under Federal Rule of Civil Procedure 12(g). It asserts that IPOX's suit should be dismissed for lack of personal jurisdiction under Rule 12(b)(2) and that none of IPOX's claims against it sufficiently states a cognizable claim for relief and that all of the claims must be dismissed under Rule 12(b)(6).

**A.    Personal jurisdiction**

"In a federal question case such as this one, a federal court has personal jurisdiction over the defendant if either federal law or the law of the state in which the court sits authorizes service of process to that defendant." *Mobile Anesthesiologists Chi., LLC v. Anesthesia Assocs. of Houston Metroplex, P.A.*, 623 F.3d 440, 443 (7th Cir. 2010). The Lanham Act does not authorize nationwide service of process, so Nikko is amenable to service only if it could be served in Illinois under Illinois law. "Illinois's long-arm statute permits the exercise of personal jurisdiction if it would be allowed under either the Illinois Constitution or the United States Constitution." *Id.* The Seventh Circuit has held that there is no meaningful difference between these constitutional limits. *See Tamburo v. Dworkin*, 601 F.3d 693, 700 (7th Cir. 2010). Under both, the

question is whether the exercise of personal jurisdiction would violate due process under the Fourteenth Amendment to the United States Constitution. *Mobile Anesthesiologists*, 623 F.3d at 443–44; *uBID, Inc. v. GoDaddy Grp., Inc.*, 623 F.3d 421, 425 (7th Cir. 2010).

"For a court to exercise personal jurisdiction over an out-of-state defendant, the key issue for constitutional purposes is whether the defendant has sufficient minimum contacts with the forum state such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Felland v. Clifton*, 682 F.3d 665, 672–73 (7th Cir. 2012) (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)) (internal quotation marks omitted). "[E]ach defendant must have purposely established minimum contacts with the forum state such that he or she 'should reasonably anticipate being haled into court' there." *Tamburo*, 601 F.3d at 701 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985)). The plaintiff bears the burden of establishing personal jurisdiction, and where, as here, the Court allows discovery and reviews evidence to resolve a dispute about facts material to the question of jurisdiction, the plaintiff must establish personal jurisdiction by a preponderance of the evidence. *See Durukan Am., LLC v. Rain Trading, Inc.*, 787 F.3d 1161, 1163–64 (7th Cir. 2015); *Purdue Research Found. v. Sanofi–Synthelabo, S.A.*, 338 F.3d 773, 783 (7th Cir. 2003).

"The nature of the defendant's contacts with the forum state determines the propriety of personal jurisdiction and also its scope—that is, whether jurisdiction is proper at all, and if so, whether it is general or specific to the claims made in the case." *Tamburo*, 601 F.3d at 701. Nikko argues, and IPOX concedes, that Nikko is not "at home" in Illinois and that its contacts with Illinois are not otherwise "continuous and

systematic" enough to confer general jurisdiction.  *See Daimler AG v. Bauman*, 134 S. Ct. 746, 761 (2014).  IPOX does not concede, however, that Nikko's contacts with Illinois were insufficient to establish specific jurisdiction.  "[T]he contacts supporting specific jurisdiction can take many different forms."  *uBID*, 623 F.3d at 426.  These forms include entering a business contract in the forum state, *see Burger King*, 471 U.S. at 476, 478–82; committing an intentional tort outside of the forum state but "expressly aimed" at the forum state, *Calder v. Jones*, 465 U.S. 783, 789–90 (1984); and sending agents to the forum state to sell or deliver goods to buyers within the state, *see Int'l Shoe*, 326 U.S. at 313–15, 320.  "The defendant must have deliberately established these contacts, or, in other words, he must have purposefully availed himself of the forum state, 'such that he should reasonably anticipate being haled into court there.'"  *Philos Techs., Inc. v. Philos & D, Inc.*, 802 F.3d 905, 913 (7th Cir. 2015) (quoting *Burger King*, 471 U.S. at 474–75).

Nikko is a Japanese company with its principal place of business in Japan.  The fund that Nikko launched is a Japanese fund that Nikko contends is only available and has only ever been marketed to Japanese investors.  Despite this, IPOX contends that Nikko's contacts with Illinois are sufficient to support specific jurisdiction.  Among other things, IPOX argues that Nikko expressly aimed its tortious conduct at Illinois.  It points out that Nikko sought out and initiated a dialogue with IPOX, it exchanged e-mails with IPOX to negotiate the terms of a contract that expressly designated Illinois as the forum in which disputes would be resolved, and it maintains a website through which it markets its products to persons in Illinois and the rest of the United States.  IPOX says that Nikko knew IPOX was an Illinois company that would experience injury and incur

damages in Illinois and that Nikko infringed IPOX's trademark rights and misappropriated IPOX's proprietary data and information with that knowledge at hand.

Nikko disagrees. First, it argues that the dialogue that Nikko initiated in August 2014 is irrelevant to the jurisdictional question. Nikko says that IPOX has not alleged that this exchange involved fraud or misrepresentation or otherwise led IPOX to reveal the trade secrets or proprietary information Nikko allegedly misappropriated. Nikko argues that because this early correspondence—which IPOX refers to as "the Alleged Correspondence"—had nothing to do with the unlawful acts IPOX alleges, it cannot be considered as a basis to support specific jurisdiction. Nikko therefore asserts that the only *relevant* contact it made with Illinois by e-mailing or calling IPOX was in response to IPOX's October 2014 cease-and-desist letter. Citing *Eco Pro Painting, LLC v. Sherwin-Williams Co.*, 807 F. Supp. 2d 732 (N.D. Ill. 2011), and *Mobile Anesthesiologists*, Nikko correctly observes that merely responding to a cease-and-desist letter without more cannot be sufficient to satisfy the minimum contacts analysis.

In *Mobile Anesthesiologists*, the defendant had no relationship with the plaintiff or the forum state and "was unaware that [plaintiff], its trademark, or its website existed until he received a cease-and-desist letter from its lawyer." *Mobile Anesthesiologists*, 623 F.3d at 442. The defendant's only contact with the forum state was that it allegedly caused injury in Illinois to a plaintiff it had not previously known existed and sent correspondence to Illinois in response to a cease-and-desist letter. *Id.* Similarly, the plaintiff in *Eco Pro Painting* contended that the court could exercise specific jurisdiction over a nonresident defendant because a licensee of the defendant had contact with the forum state, the defendant approved national advertisements, and the defendant

directed correspondence to the forum state in response to a cease-and-desist letter. *Eco Pro Painting*, 807 F. Supp. 2d at 736.  The court ruled that the licensee's contacts with the forum state could not be imputed to the defendant and that merely approving national advertisements not directed solely to Illinois and responding to a cease-and-desist letter were not sufficient contacts with the forum state to support personal jurisdiction.  *Id.* at 736–38.

This case is markedly different from *Mobile Anesthesiologists* and *Eco Pro Painting*.  Unlike the defendants in those cases, Nikko initiated a dialogue with IPOX, sought out its services, and began developing a relationship with it.  It is true that the "Alleged Correspondence"—the dialogue Nikko initiated with IPOX in August—did not include or directly result in the tortious conduct alleged.  But it is nonetheless relevant on the question of jurisdiction, because it reveals that Nikko was aware that IPOX was located, and would feel the effects of tortious acts directed against it, in Illinois.

Of course, the issue "is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way."  *Walden v. Fiore*, 134 S. Ct. 1115, 1125 (2014).  The Seventh Circuit has observed that although mere foreseeability of harm in the forum state is not enough under *Walden*, the question of whether causing harm to a resident of the forum state creates sufficient minimum contacts "is more complex."  *Advanced Tactical Ordnance Sys., LLC v. Real Action Paintball, Inc.*, 751 F.3d 796, 802 (7th Cir. 2014).  The court has not, however, drawn a bright line, instead simply repeating the Supreme Court's admonition in *Walden* that "'the plaintiff cannot be the only link between the defendant and the forum."  *Id.* (quoting *Walden*, 134 S. Ct. at 1122).

IPOX asserts that the Court has jurisdiction over Nikko not merely due to the harm it caused in Illinois, but based on the fact that Nikko deliberately set out to trade on the reputation and goodwill of an Illinois entity that it knew or had good reason to know had built its reputation and would feel an injury in Illinois. As this Court recently explained in a similar case:

> As a matter of policy, the law ought not require a holder of intellectual property . . . in these circumstances to go to the home forum of one who has, in effect, reached into the holder's home forum to take its property. When an out-of-state entity chooses to trade on the established name of an entity in the forum state and use that name for its own gain, it has, in the Court's view, established a relationship not just with the in-state entity, but with the forum state itself. This is sufficient under *Walden* and *Advanced Tactical*.

*Ariel Investments, LLC v. Ariel Capital Advisors LLC*, No. 15 C 3717, slip op. at 5 (N.D. Ill. Oct. 29, 2015) (Kennelly, J.).

Nikko corresponded with IPOX repeatedly, both before and after IPOX sent a cease-and-desist letter in October 2014. IPOX alleges that Nikko then reached into Illinois by infringing IPOX's trademark rights and attempting to capitalize on IPOX's reputation and goodwill with knowledge that IPOX had built its reputation and would be injured in Illinois. Nikko purposefully directed its conduct at Illinois, and could reasonably foresee being haled into court here. These contacts are sufficient to permit the Court to exercise personal jurisdiction over Nikko, and accordingly the Court denies Nikko's motion to dismiss under Rule 12(b)(2).

**B.      Failure to state a claim**

In a minute entry on February 11, 2016, the Court denied Nikko's Rule 12(b)(6) motion as to counts 2, 7, 9, and 10. Nikko argues that the remainder of IPOX's claims against Nikko must be dismissed for failure to state a claim. First, Nikko argues that

IPOX's common law misappropriation and unjust enrichment claims (counts 1 and 12) must be dismissed because the ITSA preempts common law claims arising from the misappropriation of confidential or proprietary information.  Second, Nikko contends that counts 3 and 4 must be dismissed because IPOX has failed to allege essential elements of its Lanham Act claims.  Third, Nikko argues that counts 5, 6, and 8 must be dismissed because there is no nexus between the state of Illinois and the unlawful conduct IPOX has alleged.[1]

When considering a motion to dismiss for failure to state a claim, the Court accepts the facts stated in the complaint as true and draws reasonable inferences in favor of the plaintiff.  *Bonnstetter v. City of Chicago*, 811 F.3d 969, 973 (7th Cir. 2016).  The Court may properly consider documents submitted by a defendant seeking dismissal only where those documents are referenced in the complaint, their authenticity is undisputed, and they are central to the plaintiff's claim.  *See Hecker v. Deere & Co.*, 556 F.3d 575, 582 (7th Cir. 2009).  To state a viable claim, a plaintiff must provide "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is plausible on its face if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### 1.    Common law claims (counts 1 and 12)

Nikko argues that IPOX's common law misappropriation claim (count 1) and its unjust enrichment claim (count 2) must be dismissed because the ITSA preempts such

---

[1] Counts 11,13, and 14 are asserted only against Lazard.

claims. The ITSA grants courts authority to enjoin actual or threatened misappropriation, 765 ILCS 1065/3, and to award damages to a person who is harmed by such misappropriation, including "the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss." *Id.* § 4(a). The ITSA provides comprehensive statutory protection of trade secrets, and "is intended to displace conflicting tort, restitutionary, unfair competition, and other laws of this State providing civil remedies for misappropriation of a trade secret." *Id.* § 8. This includes unjust enrichment claims, which are "essentially claims for restitution." *Spitz v. Proven Winners N.A., LLC*, 759 F.3d 724, 733 (7th Cir. 2014).

IPOX makes two arguments in response to Nikko's motion. First, it contends that common law misappropriation and unjust enrichment claims centered on non-trade-secret confidential information are not preempted. IPOX says to the extent counts 1 and 12 concern confidential information, that confidential information does not rise to the level of a trade secret and the ITSA does not preempt these claims. Second, IPOX argues that these claims do not arise from the misappropriation of confidential information. It contends that because the data its index maps is publicly available, and because IPOX's mark, reputation, and goodwill are not "confidential information," the ITSA does not preempt its claims.

IPOX's first argument lacks merit. As the Seventh Circuit explained in *Spitz*, the ITSA preempts all conflicting non-contract causes of action based on the misappropriation of confidential information, even if that information does not satisfy the ITSA's definition of a trade secret. *Id.* The district court decisions IPOX cites for the

contention that "preemption applies only when a claim relies on conduct involving trade secrets" and "not all confidential information is a trade secret," both predate *Spitz*.  *See Miller UK Ltd. v. Caterpillar Inc.*, 859 F. Supp. 2d 941, 944 (N.D. Ill. 2012); *Charles Schwab & Co. v. Carter*, No. 04 C 7071, 2005 WL 2369815 (N.D. Ill. 2005).  Perhaps more importantly, the plaintiffs in both cases sought to recover for wrongs beyond the mere misappropriation of confidential information.  To the extent these decisions conflict with *Spitz*, they are not persuasive.  Under the Seventh Circuit's holding in *Spitz*, IPOX cannot maintain claims of tortious misappropriation or unjust enrichment purely on the basis that Nikko pilfered and benefited from the use of confidential information.

IPOX may, however, allege tortious misappropriation and unjust enrichment that do not conflict with the ITSA.  As IPOX points out, in *Spitz* and district court decisions consistent with it, the crux of the question has been whether the claim would lie if the information at issue were not confidential.  *See, e.g.*, *Spitz*, 759 F.3d at 733 (finding that the ITSA preempted unjust enrichment claims that were "based on misappropriation of a trade secret"); *Cronimet Holdings, Inc. v. Keywell Metals, LLC*, 73 F. Supp. 3d 907, 920 (N.D. Ill. 2014) (finding misappropriation claims that "are dependent on the existence of confidential information" preempted under the ITSA); *Montel Aetnastak, Inc. v. Miessen*, 998 F. Supp. 2d 694, 720 (N.D. Ill. 2014) (finding ITSA preemption of misappropriation claims based on "the misuse of secret information"); *RTC Indus., Inc. v. Haddon*, No. 06 C 5734, 2007 WL 2743583, at *3 (N.D. Ill. Sept. 10, 2007) ("[T]he test for a non-ITSA claim . . . is whether the plaintiff's claim would lie if the information at issue were nonconfidential."); *Charles Schwab*, 2005 WL 2369815, at *4 (explaining that the ITSA does not preempt a claim that "seeks recovery for wrongs beyond the mere

misappropriation").

IPOX argues that neither its common law misappropriation claim nor its unjust
enrichment claim rise and fall with the confidentiality of what was allegedly
misappropriated. Indeed, IPOX's common law misappropriation claim does not feature
the word "confidential" at all, and its unjust enrichment claim seeks restitution of benefits
derived from misappropriating confidential and non-confidential information. IPOX
asserts that IPOX "has a proprietary interest in its IPOX® Indexes, research,
development, expertise and goodwill, which are created at a cost and expense to IPOX
and vests it with the exclusive right to license their use for trading in financial products,
and which are the valuable assets of [IPOX]." Compl., dkt. no. 1, ¶ 26. IPOX goes on
to allege that Nikko and Lazard

> created a competing fund and have used and exploited [IPOX's] IPOX®
> Indexes, and [IPOX's] track record, good will, and its reputation for
> integrity and accuracy in connection with the IPOX® Indexes, as well as
> the research and development, skills, labor, and necessary expenditures
> of Plaintiff used to create the IPOX® Indexes, without compensation to, or
> license by, [IPOX] and have thus harmed [IPOX].

*Id.* ¶ 27. IPOX's unjust enrichment claim asserts:

> Defendants have unjustly retained the benefit of Plaintiff's IPOX® Indexes,
> the IPOX Trade Secrets, and Plaintiff's track record, good will, and its
> reputation for integrity and accuracy in connection with the IPOX®
> Indexes, as well as the research and development, skills, labor, and
> necessary expenditures of Plaintiff used to create the IPOX® Indexes to
> the benefit of Defendants, and the retention of said benefit by Defendants
> violates fundamental principles of justice, equity, and good conscience.

*Id.* ¶ 91.

Portions of IPOX's unjust enrichment and common law misappropriation claims
are based on the misuse of IPOX's trademark, reputation, and goodwill. Even if IPOX
had not alleged that confidential information had been taken and misappropriated, these

claims would persist.  Taking the facts alleged in the complaint as true and drawing all

reasonable inferences in favor of IPOX, the Court concludes that IPOX has stated

claims for relief that are not preempted under the ITSA.  The Court therefore denies

Nikko's motion regarding counts 1 and 12.

### 2.    Lanham Act claims (counts 3 and 4)

In counts 3 and 4, IPOX asserts claims under the Lanham Act.  In count 3, IPOX

alleges trademark infringement under section 1114, which imposes civil liability on any

person who "use[s] in commerce" a "reproduction, counterfeit, copy, or colorable

imitation of a registered mark" that might confuse or deceive.  15 U.S.C. § 1114.  In

count 4, IPOX alleges that Nikko (and Lazard) violated section 1125, which prohibits the

"use[] in commerce" of "any word, term, name, symbol or device, or any combination

thereof, or any false designation of origin, false or misleading description of fact, or false

or misleading misrepresentation of fact" that causes confusion as to another person's

goods or services and results in consumer reliance that damages that person.  *Id.*

§ 1125.

Nikko argues that IPOX has failed to allege misconduct that falls within the

jurisdictional scope of the Lanham Act.  It also argues that count 3 should be dismissed

for failing to allege that Nikko used IPOX's mark in the United States and that count 4

should be dismissed for failing to allege actual consumer reliance.

Before the Court may address Nikko's argument that the alleged misconduct is

outside of the Lanham Act's jurisdictional scope, the Court must pause to clarify why it is

analyzing Nikko's motion under standards applicable under Rule 12(b)(6).  In the

seminal Supreme Court case concerning the extraterritorial application of the Lanham

Act, the Court intimated that a challenge like Nikko's presents a question of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). *See Steele v. Bulova Watch Co.*, 344 U.S. 280, 282 (1952). The Seventh Circuit has analyzed these challenges under Rule 12(b)(1) as well. *See Scotch Whiskey Ass'n v. Barton Distilling Co.*, 489 F.2d 809, 811–12 (7th Cir. 1973). District courts in this circuit have followed suit. *See, e.g.*, *Champion Labs., Inc. v. Central Ill. Mfg. Co.*, No. 14 C 9754, 2016 WL 164364, at *6 (N.D. Ill. Jan. 14, 2016) (framing the issue as jurisdictional); *ACG Prods., Ltd. v. Gu*, No. 10-C-716-WMC, 2011 WL 7748354 (W.D. Wis. Nov. 4, 2011) (same); *Bernstein v. Medicis Pharma. Corp.*, No. 03 C 5256, 2004 WL 2092001, at *2 (N.D. Ill. Sept. 15, 2004) (same); *Alcar Grp., Inc. v. Corp. Performance Sys., Ltd.*, 109 F. Supp. 2d 948, 951 (N.D. Ill. 2000) (same); *Thomas & Betts Corp. v. Panduit Corp.*, 71 F. Supp. 2d 838, 841 (N.D. Ill. 1999) (same); *Spartan Chem. Co., Inc. v. ATM Enters. of Am.*, No. 83 C 2444, 1986 WL 2616 (N.D. Ill. Feb. 20, 1986) (same).

Yet Nikko brings its challenge under Rule 12(b)(6), not Rule 12(b)(1). It does so, it says, because "[c]ourts in this Circuit have analyzed and granted the dismissal of Lanham Act claims based on failure to allege an effect on commerce in the United States under both Rules 12(b)(6) . . . and 12(b)(1) . . . ." Def.'s Mem., dkt. no. 32, at 20 n.1. Nikko cites no cases, and the Court's research has not turned up any, in which a court in this circuit analyzed the extraterritorial scope of the Lanham Act on a motion to dismiss for failure to state a claim under rule 12(b)(6). The cases in which courts in this circuit have analyzed under Rule 12(b)(6) whether plaintiffs sufficiently alleged an effect on commerce in the United States have done so not in dealing with extraterritorial application of the Lanham Act, but rather with whether the activity or venue in which

trademark rights were allegedly infringed was "commerce".  *See, e.g.*, *Slep-Tone Entm't Corp. v. Coyne*, 41 F. Supp. 3d 707, 713–14 (N.D. Ill. 2014); *Doctor's Data, Inc. v. Barrett*, No. 10 C 3795, 2011 WL 5903508, at *7 (N.D. Ill. Nov. 22, 2011); *Kraft Foods Holdings, Inc. v. Helm*, 205 F. Supp. 2d 942, 947 (N.D. Ill. 2002).

Over the last several years, however, both the Supreme Court and the Seventh Circuit have indicated that questions about the extraterritorial application of federal law are not jurisdictional.  In *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247, 253–54 (2010), the Supreme Court "squarely rejected the notion that the extraterritorial reach of § 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), raises a question of subject matter jurisdiction."  *Minn-Chem, Inc. v. Agrium, Inc.*, 683 F.3d 845, 851 (7th Cir. 2012) (citing *Morrison*, 561 U.S. at 254).  The Court explained that "to ask what conduct § 10(b) reaches is to ask what conduct § 10(b) prohibits, which is a merits question. Subject-matter jurisdiction, by contrast, refers to a tribunal's power to hear a case." *Morrison*, 561 U.S. at 254.  The Seventh Circuit observed in *Minn-Chem* that *Morrison* was the next in a long line of cases, several cited in *Morrison* itself, that took what was a "nascent idea" in the early years of this century and made it "a firmly established principle of statutory construction."  *Minn-Chem*, 683 F.3d at 852 (collecting cases).

Neither *Morrison* nor *Minn-Chem*, nor any of the numerous cases cited in those opinions, concerned the extraterritorial reach of the Lanham Act.  But the Court sees no reason that the logic of these opinions should not apply, and neither the Supreme Court nor the Seventh Circuit has given reason to believe otherwise.  The Court will thus analyze Nikko's motion under Rule 12(b)(6), accepting the well-pleaded allegations in IPOX's complaint as true and drawing all reasonable inferences in IPOX's favor.

The Lanham Act prohibits trademark infringement through unauthorized "use in commerce" of a registered mark or its likeness. The Act defines "commerce" as "all commerce which may lawfully be regulated by Congress." *Id.* § 1127. The Supreme Court has held that the term "use in commerce" should be construed broadly "[i]n the light of the broad jurisdictional grant in the Lanham Act." *Steele*, 344 U.S. at 286; *see also Scotch Whiskey*, 489 F.2d at 812 (observing that *Steele* "upheld a broad concept of 'commerce'").

To determine whether the Lanham Act reaches foreign business activities, "courts in this district have adhered to the test that originated with the Supreme Court's decision in [*Steele*] and was more fully developed in the Second Circuit case of *Vanity Fair Mills, Inc. v. T. Eaton Co.*, 234 F.2d 633, 642 (2d Cir. 1956)." *Bernstein*, 2004 WL 2092001, at *2; *see also ACG Prods.*, 2011 WL 7748354, at *3 (describing this test and its inconsistent parameters from circuit to circuit). Under this test, courts assess three factors: "(1) whether the allegedly infringing party was a United States citizen; (2) whether the party's actions affected commerce in the United States; and (3) whether any foreign trademark law conflicted with American trademark law." *Champion Labs.*, 2016 WL 164364, at *6; *see also Bernstein*, 2004 WL 2092001, at *2; *Alcar Grp.*, 109 F. Supp. 2d at 951; *Thomas & Betts*, 71 F. Supp. 2d at 841. No single factor is dispositive, *Champion Labs.*, 2016 WL 164364, at *6, but only one factor is disputed here. IPOX acknowledges that Nikko is a Japanese company with its principal place of business in Japan, and neither party contends that enforcing the Lanham Act would create conflicts with foreign trademark law. Thus the crucial question is whether IPOX alleges that Nikko's infringement had an effect on commerce in the United States.

IPOX contends that it suffered an injury in Illinois. It also argues that this is not the only way that Nikko's alleged infringement affected commerce in the United States. In paragraph 20 of the complaint, IPOX asserts:

> Marketing material for the Nikko Fund—available to potential U.S. investors via, *inter alia*, the Internet—prominently displayed the IPOX® trademark, made reference to and relied upon the reputation of, and goodwill in, the IPOX® name, mark and business, and the performance history of an IPOX® Index (the IPOX 100 US Index), as well as proprietary charts, data and information, including confidential information, of IPOX.

Compl., dkt. no. 1, at ¶ 20. IPOX further alleges that Nikko used the "registered IPOX® mark in commerce and [has] applied said registered mark to advertising intended to be used in commerce," *id.* ¶ 37, "used Plaintiff's IPOX® mark in commerce and in commercial advertising in a manner which falsely designates the origin of Defendants' products," *id.* ¶ 45, and "use[d] . . . in commerce . . . a false and/or misleading description or representation, and/or false designation of origin," *id.* ¶ 46.

Nikko argues that this is not sufficient to constitute an effect on commerce in the United States. It contends that the allegedly infringing fund has never been advertised in the United States and has never been marketed or made available to investors or consumers in the United States. To support this contention, Nikko cites the affidavit of its Chief Legal Officer, Ross Long, who stated that the fund was "established under the laws of Japan" and "developed and targeted for the Japanese market"; "[s]ubscriptions to the Nikko Fund are exclusively sold to investors in the Japanese market through Japanese broker-dealers"; "Nikko markets the Nikko Fund exclusively in Japan, and only to investors in the Japanese market"; and "[t]he Nikko Fund was never marketed to anyone in the United States or the State of Illinois." Long Aff., dkt. no. 32, ¶¶ 4–8. Long also affirmed that "[a]ll marketing materials for the Nikko Fund are written in the

Japanese language"; "Nikko's website containing marketing materials for the Nikko Fund is administered in Japan and written in Japanese"; "[i]nvestors cannot subscribe to the Nikko Fund through Nikko's website"; and "Nikko did not sell the Nikko Fund to any United States or Illinois investors." *Id.* ¶¶ 9–12. Nikko attached as exhibits screenshots of the fund's website, which purports to state that the fund is not available to American consumers or investors.

Nikko asserts that this case is like *Bernstein* and *Champion Laboratories*. In *Bernstein*, the court dismissed a Lanham Act claim in which the defendant allegedly manufactured and marketed products in Canada for which its license to manufacture and market had expired. *Bernstein*, 2004 WL 2092001, at *1. The court found that the plaintiff's allegations failed the second prong of the aforementioned test because the defendant's manufacturing and marketing of products in Canada "in no way affect[ed] American commerce." *Id.* at *2. Assisting in the court's decision were the unrebutted affidavits of two witnesses showing that the allegedly infringing products were "assembled and labeled exclusively in Canada with Canadian industrial and human resources and sold only in Canadian markets." *Id.* Likewise, in *Champion Laboratories*, the court dismissed a defendant's counterclaim under the Lanham Act because there was "no allegation that [the alleged false statement giving rise to liability] affected sales anywhere in the United States or its territories" and "no allegation that [defendant] suffered injury in the United States market." *Champion Labs.*, 2016 WL 164364, at *6.

*Bernstein* and *Champion Laboratories* are readily distinguishable. In neither of those two cases did the Lanham Act claimant allege that it suffered injuries in the Illinois market. Moreover, the plaintiff in this case asserts (in response to Nikko's motion) that

Nikko maintains an English-language website that touts the company's expansion into the United States and focus on providing investment opportunities to investors all over the world. This website contains marketing materials, prospectuses, and earning reports. Put differently, IPOX alleges that Nikko, which IPOX claims made infringing marketing materials available to consumers in Illinois via its website, has expressly stated on the Internet that it provides investment products and services in the United States.

More importantly, the courts in *Bernstein* and *Champion Laboratories* considered evidence that this Court cannot appropriately consider in light of the fact that it is evaluating not whether it has subject matter jurisdiction, but whether IPOX has stated a plausible claim for relief. The Seventh Circuit in *Minn-Chem* pointed out that whether a challenge like this arises under Rule 12(b)(6) or Rule 12(b)(1) "is not a picky point that is of interest only to procedure buffs." *Minn-Chem*, 683 F.3d at 852. As the court explained: "this distinction affects how disputed facts are handled, and it determines when a party may raise the point." *Id.* at 851–52. When a defendant challenges a claim for lack of subject matter jurisdiction under Rule 12(b)(1), "it is the burden of the party who seeks the exercise of jurisdiction in his favor clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution." *Id.* at 852 (quoting *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990)) (internal citations and quotation marks omitted). By contrast, a court deciding whether to dismiss for failure to state a claim under Rule 12(b)(6) must "'accept as true all of the allegations contained in a complaint,' subject, of course, to the limitations articulated in [*Twombly* and *Iqbal*]." *Minn-Chem*, 683 F.3d at 853 (quoting *Iqbal*, 556 U.S. at 678) (internal citations omitted).

It is not appropriate at this juncture for the Court to consider Long's affidavit and the evidence attached to Nikko's motion. This evidence was gathered in the course of jurisdictional discovery for the purposes of determining whether the Court could exercise personal jurisdiction over Nikko. As of yet, IPOX has had no opportunity to conduct merits discovery that might uncover evidence supportive of its allegation that infringing marketing materials were available to potential customers in the United States and affected commerce in the United States by allowing Nikko's reputation and goodwill in this country to improve at IPOX's expense. Nikko is essentially arguing that the evidence indisputably shows that it will win on the merits. This is an argument for summary judgment, not dismissal for failure to state a claim.

Nikko next contends that count 3 must be dismissed because IPOX has failed to allege "that Nikko used the mark in the United States." Def.'s Mem., dkt. no. 32, at 24. The Court disagrees. As explained above, IPOX has alleged that Nikko advertised its fund to American consumers. The fact that Nikko believes the evidence will eventually bely this claim is irrelevant at the motion to dismiss phase. For this and the reasons stated above, the Court denies Nikko's motion to dismiss count 3.

Lastly, Nikko argues that IPOX did not sufficiently plead a violation of section 1125 because it did not allege that actual consumer reliance caused it damages. IPOX does not oppose Nikko's argument. The Court therefore considers the point conceded and dismisses count 4. *See Wojatas v. Capital Guardian Trust Co.*, 477 F.3d 924, 926 (7th Cir. 2007).

### 3. State statutory claims (counts 5, 6, and 8)

Finally, Nikko moves to dismiss IPOX's deceptive trade practices, trademark

infringement, and unfair competition claims under Illinois statute and common law.  In Count 5, IPOX alleges that Nikko and Lazard, "by reason of their acts of trademark infringement and false designation of origin, false description and/or representation, and false advertising" violated the IDTPA, 815 ILCS 510/2, "by causing confusion or misunderstanding as to the source, sponsorship or approval of" Nikko's fund.  Compl., dkt. no. 1, ¶ 52.  Count 6 alleges that Nikko and Lazard violated the ITRPA, 765 ILCS 1036/65(a), and committed trademark dilution under Illinois common law.  Count 8 alleges unfair business practices and unfair competition in violation of the ICFA, 815 ILCS 505/2, and Illinois common law.

Nikko argues that count 5 must be dismissed because IPOX has failed to adequately allege that unlawful activity transpired in Illinois.  Although the IDTPA does not contain text expressly confining its application to events or circumstances arising in Illinois, there is a "long-standing rule of construction in Illinois which holds that a 'statute is without extraterritorial effect unless a clear intent in this respect appears from the express provisions of the statute.'"  *Avery v. State Farm Mut. Auto. Ins. Co.*, 216 Ill. 2d 100, 184, 835 N.E.2d 801, 854 (2005) (quoting *Dur–Ite Co. v. Industrial Comm'n,* 394 Ill. 338, 350, 68 N.E.2d 717, 722 (1946)).  Because such intent is not expressed in the statute, "'the circumstances the circumstances that relate to the disputed transaction must occur primarily and substantially in Illinois.'"  *Miche Bag, LLC v. Be You, LLC*, No. 11 C 720, 2011 WL 4449683, at *6 (N.D. Ill. Sept. 26, 2011) (quoting *Avery*, 216 Ill. 2d at 187, 68 N.E.2d at 854).  Courts weigh four factors in determining whether a transaction occurred "primarily and substantially" in Illinois: "(1) the plaintiff's residence, (2) where the misrepresentation was made, (3) where the damage to the plaintiff

occurred, and (4) whether the plaintiff communicated with the defendant in Illinois." *Specht v. Google, Inc.*, 660 F. Supp. 2d 858, 866 (N.D. Ill. 2009); *see also Miche Bag*, 2011 WL 4449683, at *6; *In re Sears Roebuck & Co. Tools Mktg. & Sales Practices Litig.*, No. 05 C 4742, 2005 WL 3077606, at *1 (N.D. Ill. Nov.14, 2005).

Each of these factors weighs in favor of finding that the alleged misconduct occurred "primarily and substantially" in Illinois. IPOX is located in Illinois. It alleges that Nikko falsely indicated on a website visible to Illinois consumers that its fund lawfully utilized an IPOX index. IPOX alleges that it experienced damage in Illinois due to "confusion or misunderstanding as to the source, sponsorship or approval" of Nikko's fund. Compl., dkt. no. 1, ¶ 52. And although IPOX does not allege that Nikko or its agents came to Illinois to discuss licensing with IPOX, Nikko communicated with IPOX in Illinois by email and telephone. IPOX has adequately alleged a viable IDTPA claim against Nikko.

Nikko moves to dismiss count 6 on the ground that IPOX did not sufficiently allege that Nikko impermissibly used IPOX's mark in Illinois. This, however, is not a required element of a claim of trademark dilution under the ITRPA or Illinois common law. To state a claim for trademark dilution, a plaintiff need only allege that a mark was used on goods "sold or transported in commerce" in Illinois or in relation to services rendered in Illinois. *Desmond v. Chi. Boxed Beef Distribs., Inc.*, 921 F. Supp. 2d 872, 883 (N.D. Ill. 2013). IPOX alleges that the mark was famous in Illinois, that it was visible to Illinois consumers in Nikko's online marketing materials, and Nikko's misuse benefitted its business at the expense of IPOX's business, both in Illinois and elsewhere. This is sufficient to state a claim.

As for count 8, it appears to the Court that IPOX asserts this claim against Lazard alone.  Nowhere in count 8 does IPOX reference Nikko or assert claims against the defendants collectively.  Instead, every allegation in count 8 targets Lazard's alleged misconduct, and IPOX's ultimate prayer for relief in count 8 requests damages and injunctive relief solely against Lazard.  Nikko is not the appropriate party to seek dismissal of count 8.

## Conclusion

For the foregoing reasons, the Court dismisses count 4 for failure to state a claim but otherwise denies Nikko's motion to dismiss [dkt. no. 30].  The Court directs Nikko to answer the complaint by no later than July 1, 2016.  The case is set for a telephone status hearing on June 16, 2016 at 8:45 a.m., for the purpose of setting a discovery and pretrial schedule.  Counsel are directed to discuss and attempt to agree upon a schedule to propose to the Court and are to file a joint status report in this regard by no later than June 15, 2016.  Counsel are also directed to set up a call-in number for the status hearing and are to advise Judge Kennelly's chambers of the details by 12:00 p.m. on June 15, 2016.

_____
MATTHEW F. KENNELLY
United States District Judge

Date:  June 9, 2016