**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **IPOX SCHUSTER, LLC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 15 C 9955** |
| | ) | |
| **NIKKO ASSET MANAGEMENT CO., LTD.,** | ) | |
| **LAZARD ASSET MANAGEMENT LLC, and** | ) | |
| **LAZARD JAPAN ASSET MANAGEMENT,** | ) | |
| **K.K.** | ) | |
| | ) | |
| **Defendants.** | ) | |

## REVISED
## MEMORANDUM OPINION AND ORDER[1]

MATTHEW F. KENNELLY, District Judge:

IPOX Schuster LLC is a small financial services firm, founded by Dr. Josef

Schuster, that produces "indexes" of companies with recent initial public offerings

(IPOs).  An IPO is what takes place when a company starts to sell stock to the public,

and an index is a collection of stocks grouped together to measure the performance of a

market.  IPOX claims that the indexes it offers can serve as a "pure proxy for economic

growth and innovation"—an appealing service for the investing industry.

Nikko Asset Management Co., a Japanese investment trust, wanted to issue a

financial product composed of the stocks of American companies that experienced an

IPO in the past five years—the "Nikko Fund."  Though they both aim to approximate the

same market, there is a distinction between an index, a measurement of a market, and

a fund, a product comprising the stocks of companies within that market.

---

[1] The Court issues this revised decision based on the parties' various motions to clarify
or reconsider filed with respect to the decision originally issued on December 28, 2017.

Nikko contracted with Lazard Asset Management (LAM) and Lazard Japan Asset Management (LJAM), together "Lazard," to identify the companies that should be included within the Nikko Fund. IPOX alleges that the defendants violated its rights in various ways during the development and marketing of the Nikko Fund.

Nikko and Lazard have moved for summary judgment on the thirteen counts in IPOX's complaint and on IPOX's request for punitive damages. IPOX has cross-moved for summary judgment on the defendants' affirmative defenses.

## Background

Nikko is a financial services corporation organized under the laws of Japan. Several years prior to this litigation, it operated the Nikko Growing Venture Fund, an investment trust that invested in Japanese companies with IPOs in the previous five years. In late 2013, the company wanted to create an analogous fund that would invest in American companies with recent IPOs. This fund, the subject of this litigation, is referred to as the Nikko Fund.

To set up this fund, Nikko asked LJAM and LAM to select and trade the stocks in the Nikko Fund. Unlike some passively-managed funds, whose composition is determined by an index, the Nikko Fund is an actively managed fund whose composition is based upon the research and advice of investment advisors. In an agreement between Nikko and LAM establishing their relationship, they agreed that LJAM would provide services to LAM to help form the Nikko Fund.

LAM and LJAM both contend they were unfamiliar with IPOX before beginning work on the Nikko Fund. But by August 2014, prior to any direct contact with IPOX employees, LAM employees were acquainted with the IPOX indexes. LAM employees

utilized information about the IPOX index to guide their own investment decisions. In one e-mail sent in early August, an analyst described how he compared the Nikko Fund model against the performance of the IPOX index. IPOX Ex. 101 at LAM00020446. Another e-mail expressed concern that the weighting of the Nikko Fund—the proportion of certain investments relative to others—disfavored large corporations as compared to the IPOX index. IPOX Ex. 69 at LAM00016478. The record does not identify the source of the information used by the LAM employees. At the same time these e-mails were exchanged, Erik Miller, a LAM employee, e-mailed a question to Schuster about how he compiled the IPOX index. Schuster provided information to Miller that he later conceded was confidential.

Michael Krenn, the LAM employee responsible for securing licenses for services like the IPOX index, e-mailed Schuster to request a license for the index. Lazard Ex. 96 at IPOX00000493. IPOX offered prospective customers the option of a data license, which authorizes the licensee to use the IPOX indexes internally, and a product license, which permits use of the IPOX indexes to create a new product. IPOX LR 56.1 Stmt. ¶¶ 11-12. IPOX charges data licensees a flat cost and product licensees a percentage of the value of IPOX-based products that they sell. *Id.* Schuster provided Krenn, and several other LJAM employees, a free trial: "Happy to extend this for one month. Please note that a license is required, should you be interested in using the index etc. for a product." Lazard Ex. 97 at LAM00000416. Schuster also protected the confidentiality of his information by including, in some attachments, notices like "Confidentiality Disclaimer applies." *See, e.g.,* Lazard Ex. 85 at IPOX00004904.

LJAM employees began to contact Schuster with specific questions about the

inner workings of the IPOX index. Schuster provided detailed information on how the IPOX index was compiled. *See, e.g.,* Lazard Ex. 87 at IPOX00006888 (e-mail from Schuster describing "the index construction process"). At one point, Shintaro Kambara, an LJAM employee, mentioned in an e-mail that he had been involved in an IPO fund with Kosaka, who was already corresponding with Schuster. Lazard Ex. 142 at IPOX00006875. Kosaka, Kambara's manager, told Kambara not to mention the existence of the IPO fund. IPOX Ex. 130 at LAM00061607. Schuster e-mailed Kambara back to confirm that an IPO fund was being formed. In response, Kambara stated: "Actually, we don't decide to launch a IPO fund now and we are conducting due diligence of relevant IPO Index." Lazard Ex. 89 at IPOX00001755. Schuster and Lazard employees continued to correspond.

In mid-September 2014, representatives of Nikko, LJAM, and LAM traveled to New York City to present the Nikko Fund to SMBC Nikko, a major potential investor. At the presentation, the defendants shared a PowerPoint that touted the benefits of investing in the U.S. IPO market. The title slide included the name of each defendant. One slide stated "The Post IPO Index (IPOX-100US) Tends to Perform Well in Almost Every Market Environment." IPOX Ex. 72 at LAM00153200 (PowerPoint). Other slides also referred to IPOX's strong performance.

Separately, Nikko introduced marketing materials onto its website around October 1, 2014, the date of the launch of the Nikko Fund. The website was targeted solely to Japanese investors, was written in Japanese, and did not provide an option to purchase into the Nikko Fund from the site itself. On the website, the IPOX trademark was used in a chart comparing the strong performance of the IPOX index against three

other indexes that did not measure the IPO market.

While using a search engine directed towards Japanese websites, Schuster learned of the materials on the Nikko website on October 16, 2014.  By the end of October, Schuster, suspecting that Lazard was not merely conducting due diligence of the IPOX index, e-mailed Krenn to "retract" the "data license proposal" he extended to LAM in order to secure a license with Nikko directly, the "funds sponsor."  Lazard Ex. 106 at IPOX00002949.  In his response e-mail, Krenn implied he did not know which fund Schuster was talking about.  *Id.*  Schuster and Krenn never reached an agreement on a license.

In August 2014, Schuster had separately begun negotiations with Nikko for a license after Ronald Cajetan, an IT professional employed by Nikko, requested a data license.  Nikko Ex. N at IPOX00007060.  Schuster sent Cajetan a proposal, to which Cajetan stated "we are OK to move forward with the signing."  But Cajetan responded to his own message to inform Schuster that the Nikko "business side" asked Cajetan not to sign the license.  On October 16, 2014, after learning of Nikko's use of the IPOX mark on its Japanese website, Schuster e-mailed Cajetan and instructed him to direct Nikko's legal counsel to reach out to IPOX regarding the alleged infringement.  Cajetan and Schuster began to negotiate an agreement again.

Schuster insisted that Nikko take a product license.  Cajetan responded:  "After your product's license infringement by us, I know I should not ask you but would it be possible to . . . revert back to [the data license] you first quoted for me."  IPOX Ex. 91 at Nikko_0000058.  Cajetan e-mailed Schuster a marked-up proposal, to which Schuster agreed.  To ensure Schuster had adopted the marked-up proposal, Cajetan wanted to

see the revised agreement before assenting to it.  On October 28, Schuster responded: "Let me know if you are OK with countersigning then I will mail the original documents to you."  This document, which Schuster e-mailed to Cajetan on October 29, 2014, is the one IPOX alleges is the basis of an express contract between Nikko and IPOX.  The "business side" of Nikko again intervened to instruct Cajetan to reject the agreement. Nikko also removed all reference to IPOX on its website by February 2015.

Under the terms of the purported agreement formed at the end of October, IPOX was responsible for sending Nikko daily updates on the performance of the IPOX indexes.  It began sending data updates in February upon advice of its counsel.

The current version of IPOX's complaint in this lawsuit asserts fourteen claims against Nikko, LJAM, and LAM.  IPOX alleges the defendants committed misappropriation under Illinois common law (Count 1) and the Illinois Trade Secrets Act (ITSA), 765 ILCS 1065/2 (Count 2), and infringed IPOX's trademark under Illinois common law and the Lanham Act, 15 U.S.C. § 1114 (Count 3).  The Court previously dismissed the fourth count of IPOX's amended complaint.  IPOX also alleges the defendants violated the Illinois Deceptive Trade Practices Act, 815 ILCS 510/2 (Count 5), and the Illinois Trademark Registration Protections Act, 765 ILCS 1036/65(a) (Count 6).  Against LJAM and LAM, IPOX alleges fraud (Count 7) and violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/2 (Count 8). IPOX also asserts against Nikko a claim for breach of express contract (Count 9) and a claim for breach of implied contract (Count 10).  IPOX also alleges LAM breached an implied contract (Count 11), interfered in IPOX's contract with Nikko (Count 13), and interfered with a prospective business relationship (Count 14).  IPOX also asserts an

unjust enrichment claim against all defendants (Count 12).

Nikko and Lazard have both moved for summary judgment. Lazard also moved for summary judgment on IPOX's request for punitive damages on several counts. IPOX cross-moved for summary judgment on Nikko and Lazard's affirmative defenses.

## Discussion[2]

A party is entitled to summary judgment if it can demonstrate that the non-movant has not presented enough evidence for a reasonable jury to find in its favor. Fed. R. Civ. P. 56(a); *Marr v. Bank of America, N.A.*, 662 F.3d 963, 966 (7th Cir. 2011). The Court grants the non-movant all reasonable inferences supported by the record. *United States ex rel. Yannacopoulos v. Gen. Dynamics*, 652 F.3d 818, 823 (7th Cir. 2011).

Before addressing the specific claims asserted by IPOX, the Court must consider whether LJAM acted as an agent of LAM in its dealings with IPOX. The existence of an agency relationship is a question of fact to be determined by the jury, unless the relationship is "so clear as to be undisputed." *Rankow v. First Chicago Corp.*, 870 F.2d 356, 359 (7th Cir. 1989), quoting *St. Ann's Home for the Aged v. Daniels*, 95 Ill. App. 3d 576, 579, 420 N.E.2d 478, 481 (1989). An agent may possess express authority, which is directly granted in express terms, or implied authority, which is inferred from the conduct of the principal. *Curto v. Illini Manors, Inc.*, 405 Ill. App. 3d 888, 892, 940

---

[2] The plaintiff and defendants have cross-moved for summary judgment. For ease of reference, the Court cites to the memoranda supporting the parties' motions for summary judgment and IPOX's memorandum in response to the defendants' motions and in support of its own motion as "[Party] Mem. for Summ. J." The Court cites to the memoranda in opposition to the other party's motion and in support of its own motion as "[Party] Reply Br." Thus "IPOX Mem. for Summ. J." refers to "Plaintiff's Memorandum of Law in Opposition to Defendants' Motions for Summary Judgment and Cross Motion for Summary Judgment."

N.E.2d 229, 233 (2010).  There is evidence from which a reasonable jury could find that LAM conferred both express and implied authority to LJAM.  Specifically, there is evidence of express authority based upon the agreement between Nikko and LAM, which stated that LJAM was an affiliate of LAM that would "provide services to [LAM] to intermediate for the conclusion of this agreement."  Lazard Ex. A at LAM00000552. And there is evidence that LJAM derived implied authority from its course of conduct with LAM.  Specifically, LAM described LJAM as its subsidiary.  Mazzari Decl. ¶ 1. LAM did not rebuke LJAM for asking if it was interested in forming a business relationship between Nikko and LAM.  Lazard LR 56.1 Stmt. ¶ 13.  LJAM employees were responsible for "introduc[ing] the strategies . . . run by Lazard New York . . . to Japanese investors."  Lazard Ex. 8 at 10 (Kosaka deposition).  These circumstances are sufficient for a jury to reasonably conclude that LAM intended LJAM to act as its agent in dealings related to Nikko.  *Curto*, 405 Ill. App. 3d at 892, 940 N.E.2d at 233.

**I.    Misappropriation**

**A.    Count 1:  Misappropriation under Illinois common law**

IPOX alleges that Nikko, LJAM, and LAM misappropriated its index under Illinois common law.  As the Court previously held, in Illinois the common law tort of misappropriation applies only to non-confidential information given the preemptive effect of the Illinois Trade Secrets Act (ITSA) with regard to confidential information.  *IPOX Schuster, LLC v. Nikko Asset Mgmt. Co.*, 191 F. Supp. 3d 790, 802 (N.D. Ill. 2016).

The "hot news" tort, first described in *International News Service v. Associated Press*, 248 U.S. 215 (1918), applies in cases in which "(i) a plaintiff generates or gathers information at a cost; (ii) the information is time-sensitive; (iii) a defendant's use of the

information constitutes free-riding on the plaintiff's efforts; (iv) the defendant is in direct competition with a product or service offered by the plaintiffs; and (v) the ability of other parties to free-ride on the efforts of the plaintiff or others would so reduce the incentive to produce the product or service that its existence or quality would be substantially threatened." *Nat'l Basketball Ass'n v. Motorola, Inc.* (*NBA*), 105 F.3d 841, 845 (2d Cir. 1997) (interpreting New York state misappropriation law). *See Chicago Bd. Options Exch., Inc. v. Int'l Sec. Exch., L.L.C.*, 2012 IL App (1st) 102228, ¶ 45, 973 N.E.2d 390, 404-05 (Illinois and New York law on misappropriation is the same).

IPOX attempts to analogize its claim to the claim asserted in *Board of Trade of City of Chicago v. Dow Jones & Co.*, 98 Ill. 2d 109, 456 N.E.2d 84 (1983). In *Board of Trade*, the Illinois Supreme Court affirmed a declaratory judgment that the Chicago Board of Trade's plan to issue a futures contract based upon the Dow Jones Industrial Average, an index, constituted misappropriation. *Id.* at 121-23, 456 N.E.2d at 89-91.

IPOX's allegations depart from *Board of Trade* in two ways usefully understood through the *NBA* elements. First is the requirement that the information be time-sensitive. *NBA*, 105 F.3d at 845. In *Board of Trade*, the proposed product was a passively-managed security, meaning that its composition was determined entirely on the most recent movements of the index on which it was based. *Bd. of Trade*, 98 Ill. 2d at 114, 456 N.E.2d at 86. The alleged use of the IPOX index is not time-sensitive, as the Nikko fund is not passively managed via the movements of the IPOX index. Rather, the Lazard employees actively manage the fund, using information other than that provided by the IPOX index.

Second, for this same reason, IPOX cannot establish that Lazard's use of its

index constitutes free-riding.  *NBA*, 105 F.3d at 845.  The product that the Chicago Board of Trade wanted to sell changed whenever the Dow Jones Industrial Average changed:  if the composition of the index shifted, the composition of the futures contract automatically shifted.  *Bd. of Trade*, 98 Ill. 2d at 114, 456 N.E.2d at 86.  The composition of the Nikko Fund may change alongside the IPOX index, but that is only because analysts at LAM and LJAM are tasked with constructing a basket of securities that track the same market of companies with recent IPOs that the IPOX index measures.  The efforts of LAM and LJAM, not the IPOX index, control the composition of the Nikko Fund.

For these reasons, IPOX cannot sustain a common law misappropriation claim.  The defendants are entitled to summary judgment on Count 1.

### B.      Count 2:  Misappropriation under the Illinois Trade Secrets Act

IPOX alleges that Nikko, LAM, and LJAM misappropriated its trade secrets in violation of the ITSA, 765 ILCS 1065/2.  To sustain a claim for misappropriation of a trade secret, IPOX must show (1) there was a trade secret, (2) the trade secret was misappropriated, and (3) the defendants used the trade secret in the course of business.  *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 721 (7th Cir. 2003).  The defendants argue that they are entitled to summary judgment because IPOX cannot show the information at issue was a trade secret.

The ITSA defines a trade secret as information that is sufficiently secret to derive economic value and is subject to reasonable efforts to maintain its secrecy.  765 ILCS 1065/2(d).  If the plaintiff does not take reasonable steps to maintain the secrecy of the information, the law will not consider the information to be a trade secret.  *Rockwell*

*Graphic Sys., Inc. v. DEV Indus., Inc.*, 925 F.2d 174, 177-79 (7th Cir. 1991). If the plaintiff intentionally releases the information to the public, he or she "can no longer make a successful trade secrets misappropriation claim because the information is not subject to reasonable efforts to maintain secrecy." *Ho v. Taflove*, 648 F.3d 489, 504-05 (7th Cir. 2011).

As Lazard notes, Schuster has presented a great deal of information about the IPOX indexes to the public through the IPOX website, PowerPoint presentations, and a publicly-released book chapter. Any information contained in these publicly-available disclosures cannot be a trade secret. *See* Dkt. No. 138 (stipulation identifying all content available on the IPOX website from January 1, 2012 through December 31, 2015); Lazard Exs. 46-55 (collected PowerPoints); Lazard Ex. 73 (Josef A. Schuster, *Indexing the IPO Sector with IPOX*$^{TM}$ *Indices*, *in* Initial Public Offerings: An International Perspective (Greg N. Gregoriou ed. 2006)).

At issue is whether IPOX took reasonable steps to protect the confidentiality of non-public information that Lazard obtained from IPOX, either through its free trial or through e-mail correspondence with Schuster. As IPOX notes, what is reasonable for one entity to take may be unreasonable for another, smaller entity. *See Elmer Miller, Inc. v. Landis*, 253 Ill. App. 3d 129, 134, 625 N.E.2d 338, 342 (1993) ("reasonable steps for a two or three person shop may be different from reasonable steps for a larger company."). IPOX has four employees, Schuster Decl. ¶ 3, and it may be less capable than its larger peers of bearing the costs and burdens of completely securing its trade secrets.

IPOX has produced enough evidence to permit a reasonable jury to find that it

took reasonable steps to protect its non-public information. One document that Schuster e-mailed to an LJAM employee contained strategies on how the IPOX indexes were composed. It was marked with "Confidentiality disclaimer applies" at the bottom of each page. Lazard Ex. 14 at 491-92 (Schuster deposition); Lazard Ex. 85 at IPOX00004894 (e-mails between Schuster and Kosaka). Likewise, after Schuster shared a free license with LAM employees, he notified Krenn that "a license is required, should you be interested in using the index etc. for a product." Lazard Ex. 97 at LAM00000415. Schuster continued to pursue a product license after this exchange. To be clear, a reasonable jury could find in Lazard and Nikko's favor: the facts show that Schuster's efforts to protect the secrecy of the information were often less than painstaking. Erik Miller, a former employee of LAM, e-mailed Schuster with a question about the composition of the IPOX index, which Schuster answered without any effort to protect the confidentiality of that information. Lazard Ex. 84 at IPOX0003073 (e-mails between Miller and Schuster). Summary judgment, however, is only appropriate when the moving party shows that a reasonable jury must find in its favor. *Marr*, 662 F.3d at 966. Because a reasonable jury could decide this question either way, the Court declines to grant Lazard and Nikko summary judgment on whether IPOX's information constituted a trade secret.

In its motion for summary judgment, Nikko offers an argument against extraterritorial application of the ITSA, contending that it did not receive a trade secret from Illinois, use a trade secret in Illinois, or cause IPOX harm in Illinois. Nikko Mem. for Summ. J. at 14. Nikko's assertion is wrong on the law and the facts. First, on the law: unlike other Illinois statutes that courts have found to be geographically limited, the

ITSA may be applied extraterritorially. In reaching this conclusion, the Court agrees with the reasoning of *Miller UK Ltd. v. Caterpillar Inc.*, No. 10 C 3770, 2017 WL 1196963 (N.D. Ill. Mar. 31, 2017) (holding that the ITSA may be applied extraterritorially). Unlike in *Avery v. State Farm Mutual Automobile Insurance Co.*, 216 Ill. 2d 100, 835 N.E.2d 801 (2005), in which the Illinois Supreme Court concluded that the Illinois Consumer Fraud Act lacked extraterritorial application, *id.* at 183-85, 835 N.E.2d at 852-53, the ITSA's statutory language permits broader geographic application of trade secret protections. 765 ILCS 1065/8(b)(1) ("a . . . duty to maintain secrecy or limit use of a trade secret shall not be deemed to be void or unenforceable solely for lack of . . . geographical limitation on the duty."). *See also Miller UK*, 2017 WL 1196963, at *7. Nikko's argument also misstates the facts. The evidence indicates that Nikko used LJAM as a conduit to request and receive information from IPOX, which is based in Illinois. IPOX Ex. 210 at 54-55 (deposition of Shintaro Kambara, describing the information flow from IPOX to LJAM to Nikko); IPOX Ex 240 at 68-69 (same). In short, even if the ITSA cannot be applied to extraterritorial conduct, there is evidence supporting a contention that Nikko obtained a trade secret from an entity based in Illinois. For the foregoing reasons, the Court denies the defendants' motions for summary judgment on Count 2 as to non-public information, but grants the motion for any information that IPOX publicly distributed, as defined in Dkt. No. 138.

Lazard has also moved for summary judgment on IPOX's request for punitive damages for its ITSA claim. Lazard Mem. for Summ. J. at 40. Punitive damages under the ITSA are appropriate if the plaintiff may show "willful and malicious" misappropriation. 765 ILCS 1065/4(b). A plaintiff can satisfy this standard by showing

13

"intentional misappropriation" or "a misappropriation resulting from the conscious disregard of the rights of another." *Mangren Research & Dev. Corp. v. Nat. Chem. Co., Inc.*, 87 F.3d 937, 946 (7th Cir. 1996).

A jury could reasonably infer from the evidence that Nikko, LJAM, and LAM all intentionally misappropriated or consciously disregarded IPOX's rights. Nikko asked LJAM to obtain sensitive information from IPOX, which LJAM would then communicate back to Nikko, even while denying its employees were working on a fund. IPOX Ex. 210 at 54-55, 68-69 (Kambara deposition); Lazard Ex. 89 at IPOX00001755 (e-mail from Kambara to Schuster, stating "we don't decide to launch a IPO fund now"). Finally, LAM may be liable, as (1) LJAM acted as its agent in procuring this information and (2) Krenn misled Schuster by telling him that IPOX was not being used as a benchmark in the Nikko Fund, Lazard Ex. 135 at IPOX00001619, though it had been used as one as recently as August. IPOX Ex. 101 at LAM00020446 (LAM employees discuss using the IPOX-100 US as a benchmark for the Nikko Fund). Because a jury could reasonably find that each of the defendants intentionally misappropriated IPOX's trade secrets, which would entitle IPOX to punitive damages under the ITSA, the Court declines to grant the defendants' motion for summary judgment on damages.

## II. Trademark infringement

### A. Count 3: Trademark infringement under the Lanham Act and Illinois common law

IPOX alleges that the defendants infringed its trademark in violation of the Lanham Act and Illinois common law. The Court applies the same analysis for the Lanham Act and common law claims. *TMT N. Am., Inc. v. Magic Touch GmbH*, 124 F.3d 876, 881 (7th Cir. 1997) ("federal and state laws regarding trademarks . . . are

substantially congruent.") (citation omitted); *Top Tobacco v. Fantasia Dist. Inc.*, 101 F. Supp. 3d 783, 788 (N.D. Ill. 2015) (same). IPOX alleges the defendants infringed its trademark on two occasions: first, when Nikko used the mark in advertising materials on its website and, second, when Nikko and Lazard used the mark in a sales presentation to a client in New York City. Because these allegations raise distinct legal issues on summary judgment, the Court considers them separately.

### 1. Nikko website

IPOX alleges that the defendants violated the Lanham Act by employing its mark on Nikko's website. Nikko's website featured the IPOX mark on some marketing materials, most notably, on a chart comparing the performance of the IPOX index with several other indexes. IPOX Ex. 34 at IPOX00000582 (image of the Nikko website). IPOX argues that LAM and LJAM are also liable for trademark infringement. To demonstrate trademark infringement, a plaintiff must show the defendant used the plaintiff's mark in a manner that is likely to cause confusion among customers. *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 897 (7th Cir. 2001).

LAM and LJAM are entitled to summary judgment, as IPOX has not offered any evidence showing that these parties used its mark. IPOX argues that LAM and LJAM were complicit in Nikko's decision to use the IPOX mark in its marketing materials. IPOX LR 56.1 Stmt. ¶ 81. Review of the exhibits to which IPOX directs the Court's attention shows e-mails among Lazard employees preparing materials describing how investments are screened, analyzed, and selected for inclusion in the Nikko Fund. *See, e.g.,* IPOX Ex. 244 at LAM00024726. IPOX also alleges that Lazard provided the information that Nikko used to create the allegedly infringing chart, IPOX Ex. 52 at

NIKKO_0010257, but not that LAM or LJAM asked or instructed Nikko to use IPOX's mark in their marketing efforts.  Without more, IPOX has not offered any evidence upon which a reasonable jury to rely to make a finding that Lazard was responsible for or complicit in Nikko's alleged infringement.  Lazard is entitled to summary judgment on trademark-based claims arising from Nikko's use of the mark on its website.

Turning to Nikko, the issue is whether the Lanham Act applies extraterritorially to the conduct of a Japanese company on a website that is targeted solely to a foreign market.  As this Court explained in a prior opinion in this case, courts consider three factors to determine whether the Lanham Act has extraterritorial application:  "(1) whether the allegedly infringing party was a United States citizen; (2) whether the party's actions affected commerce in the United States; and (3) whether any foreign trademark law conflicted with American trademark law."  *IPOX Schuster, LLC*, 191 F. Supp. at 805 (collecting cases).  Nikko is not a United States citizen, and there is no indication that there is a conflict between American and Japanese trademark law.  Thus the Court focuses only on the second factor.

Did Nikko's decision to employ the IPOX mark on its website affect commerce in the United States?  IPOX argues it did.  First, IPOX argues that Nikko also used the mark during a presentation in New York.  IPOX Mem. for Summ. J. at 23.  This is beside the point:  the question is whether extraterritorial use of a trademark affected commerce in the United States, not whether there was also non-extraterritorial use.  Next, IPOX claims the revenues of the Nikko Fund were re-invested in the United States, but it does not point the Court to a case in which this sort of attenuated relationship between an infringement and U.S. commerce supported a copyright infringement claim.  If

commerce were defined so broadly as to include the proceeds of foreign activity that find their way back into the American economy, then there would be few instances in which the Lanham Act would not apply extraterritorially. Finally, IPOX argues that Nikko's display of its mark on the Internet was readily available to American consumers. *Id.* But the presence of an allegedly infringing mark on a foreign website on which American consumers are not shopping is insufficient to satisfy the second element. *See, e.g., Champion Lab., Inc. v. Central Ill. Mfg. Co.*, 157 F. Supp. 3d 759, 767 (N.D. Ill. 2016) (no extraterritorial application of a Lanham Act claim based on an e-mail about an American product sent to Latin American distributors who did not service the United States); *ACG Prod., Ltd. v. Gu*, No. 10-C-716-wmc, 2011 WL 7748354, at *4 (W.D. Wis. Nov. 4, 2011) (no extraterritorial application of a Lanham Act claim based on a Chinese website selling a counterfeit product with an American company's trademark that was never sold to Americans); *Bernstein v. Medicis Pharm. Corp.*, No. 3-C-5256, 2004 WL 2092001, at *2 (N.D. Ill. Sept. 15, 2004) (no extraterritorial application of a Lanham Act claim alleging that a company whose activities are wholly within Canada infringed the plaintiff's trademark rights).

In *McBee v. Delica Co.*, 417 F.3d 107 (1st Cir. 2005), the First Circuit affirmed that Cecil McBee, an American jazz musician, could not apply the Lanham Act extraterritorially to Cecil McBee, a Japanese clothing brand whose website prominently used "Cecil McBee." *Id.* at 112-13, 124. Although the plaintiff was able to purchase a few items from the website that were shipped to the United States, there was no evidence that any other products had ever been sold in America. *Id.* at 113. The website was written in Japanese and was easily distinguishable from other websites

involving McBee, the musician. *Id.* at 124. Finally, McBee could offer no evidence that American consumers had become confused by the website. *Id.* All of the same is true in the instant case: the Nikko Fund has not been sold in the United States, Nikko Ex. A (Long declaration); the use of the IPOX mark is situated within Japanese text, *id.*; the Nikko website is easily distinguished from IPOX sites, *id.*; and IPOX has offered no evidence whatsoever that American consumers were confused by the Nikko website. Because the Lanham Act cannot apply extraterritorially to a foreign party where there is no effect upon U.S. commerce, Nikko is entitled to summary judgment.

###### 2. Sales presentation

IPOX alleges that Nikko and Lazard violated the Lanham Act by employing the IPOX mark during a sales presentation in New York City. Lazard hosted a meeting that Nikko and SMBC Nikko, a potential customer of the Nikko Fund, attended. It is not clear from the record whether an actual transaction occurred or if the meeting involved only marketing the Nikko Fund.[3] Just as Lazard argued it was uninvolved in the creation of Nikko's website, Nikko disputes that it was involved in the creation of the presentation or that SMBC Nikko was a potential customer. Nikko Reply Br. at 3. Yet IPOX presented evidence suggesting both that Nikko was involved in the creation of the materials involving IPOX and that SMBC Nikko was viewed as a customer. IPOX Ex. 60 at LAM00017472-73. In an e-mail dated prior to the New York presentation, Kosaka described a meeting he held with Nikko in which he presented the Nikko Fund "portfolio

---

[3] The defendants suggest, without elaboration, that a single presentation is insufficient to bring the defendants' conduct within the meaning of "commerce" under the Lanham Act. Lazard Reply Br. at 2; Nikko Reply Br. at 3-4. This "perfunctory and undeveloped argument[]" is insufficient to raise the issue. *Crespo v. Colvin*, 824 F.3d 667, 674 (7th Cir. 2016).

idea," discussed the use of the IPOX index as a benchmark measure, and learned Nikko wanted Lazard to present the materials to SMBC Nikko, their "largest target customer." *Id.* In particular, in reference to testing the performance of the Nikko Fund against the IPOX index, Kosaka wrote "Nikko prefers that they wait to see the result before taking to SMBC Nikko." *Id.* at LAM00017473. A reasonable jury could infer that Nikko is also responsible for the New York City presentation, which IPOX alleges infringed its rights under the Lanham Act.

To prevail on a Lanham Act claim, IPOX must demonstrate that (1) the mark at issue is protectable and (2) there is a likelihood of confusion from the infringing use. *Ty, Inc.*, 237 F.3d at 897. No one disputes that the IPOX mark is protectable. Thus the issue before the Court is whether IPOX has introduced evidence from which a reasonable jury could find that the use of the IPOX mark in the New York presentation gave rise to a likelihood of confusion regarding the relationship between IPOX and the Nikko Fund. *Id.* To evaluate this question, the Court considers: "(1) the similarity of the marks in appearance and suggestion; (2) the similarity of the products; (3) the area and manner of concurrent use; (4) the degree of care likely to be used by consumers; (5) the strength of the plaintiff's mark; (6) whether any actual confusion exists; and (7) the defendant's intent to palm off its goods as those of the plaintiff[ ]." *Id.*

The first factor favors IPOX. The original mark and the infringing use are identical, as the defendants used IPOX's mark in their presentation.

The second factor, the similarity of the products, likewise favors IPOX. Though the specific products are distinct—IPOX-100 US is an index; the Nikko Fund is an investment product—they are closely related in that one measures the IPO market,

while the other provides investors a way to invest in that market. Modern trademark law protects "closely related products," such as beer and whiskey, linens and perfume, dog toys and dog shows, and liquor and restaurants. *Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 958 (7th Cir. 1992).

The third factor (the manner of concurrent use of the marks) and the seventh factor (the defendant's intent to palm off its goods) involve the same facts. The defendants' central contention is that the use of the IPOX mark was comparative, not infringing. Nikko Mem. for Summ. J. at 9. As the Seventh Circuit has recognized, use of a rival's mark may promote competition within a market, as it aids consumers in comparing two or more goods. *August Storck K.G. v. Nabisco, Inc.*, 59 F.3d 616, 618 (7th Cir. 1995) (there is no infringement where the purpose of the use of a mark is not to blur the distinction between products, but to distinguish them). A reasonable jury could find this was not the aim here. The allegedly infringing chart compares the historical performance of the IPOX index against the S&P 500, the Russell 2000, and the Nasdaq, none of which follows the IPO market. IPOX Ex. 72 at LAM00153199. The Nikko Fund, which had not yet been created and lacked historical performance information, was not on the chart. Thus the use of the IPOX mark in this chart can be easily distinguished from the use of the rival's mark in *August Storck*: whereas the defendant in *August Storck* sought to use the plaintiff's mark to distinguish the goods, the present defendants sought to use IPOX's mark as a proxy for the performance of their own product.

The fourth factor, the degree of care likely to be used by customers, favors the defendants. The potential customers of the Nikko Fund—all of whom are sophisticated

investors—were likely discriminating in their review of investment opportunities. *See Forum Corp. of N. Am. v. Forum, Ltd.*, 903 F.2d 434, 442 (7th Cir. 1990).

The defendants allege the fifth factor, the strength of the mark, disfavors IPOX. "The strength of a mark usually corresponds to its economic and marketing strength." *AutoZone, Inc. v. Strick*, 543 F.3d 923, 933 (7th Cir. 2008). Nikko argues IPOX has not offered any evidence of its mark's strength. Nikko Reply Br. at 5. IPOX, however, contends that its mark is associated with over $3 billion in IPOX-linked products. Schuster Decl. ¶ 4. Because it is unclear whether consumers associate these products with IPOX itself, the Court concludes the fifth factor is inconclusive. Finally, IPOX presents no evidence of actual confusion, the sixth factor.

When these factors are considered together, the scale does not tip so far in defendants' direction as to warrant summary judgment in their favor. A reasonable jury could find that the defendants' efforts to associate IPOX with the Nikko Fund produced a likelihood of confusion. The Court denies defendants' motion for summary judgment on Count 3.

Lazard also moved for summary judgment on IPOX's request for treble damages for its Lanham Act claim. Lazard Mem. for Summ. J. at 25. What Lazard is challenging is not quite clear. The Lanham Act permits the court to assess damages *up to* three times actual damages, 15 U.S.C. § 1117(a), as well as treble damages for the use of a counterfeit mark (which is not at issue here). *Id.* § 1117(b). If IPOX successfully establishes liability under section 1117(a), there are three nonexclusive monetary remedies: "(1) recovery of profits; (2) damages sustained by the plaintiff; and (3) costs of the action." *Sands, Taylor & Wood*, 34 F.3d at 1347. Though Lazard contends that

IPOX may not recover higher damages, because it has not offered evidence it sustained damages, IPOX has produced damage estimates from its expert. Duski Decl. ¶¶ 6-8. Damages, moreover, are not the only available remedy. The Court declines to grant summary judgment for Lazard on this point.

**B.     Count 5:  Deceptive trade practices under the Illinois Uniform Deceptive Trade Practices Act**

IPOX contends that the defendants violated the Illinois Uniform Deceptive Trade Practices Act by using IPOX's mark in their business in a manner that caused a likelihood of confusion regarding the source of the goods or their affiliation. *See* 815 ILCS 510/2. The Deceptive Trade Practices Act provides only for injunctive relief, 815 ILCS 510/3, and the party seeking relief must be able to identify future harm to be enjoined. *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 740 (7th Cir. 2014).

The defendants contend that IPOX cannot identify any future harm to be enjoined: neither Nikko nor Lazard plans to use the IPOX mark in the future. Nikko Mem. for Summ. J. at 15; Lazard Mem. for Summ. J. at 13. Nikko ceased any use of the mark in its marketing materials as of February 2015. Nikko Ex. AC at IPOX00002136. IPOX essentially concedes this to be this case, as it argues that the future harm to be enjoined is the operation of the Nikko Fund itself. IPOX Mem. for Summ. J. at 29.

IPOX has failed to provide evidence that would support a finding that the ongoing operation of the Nikko Fund will cause the sort of harm that the Deceptive Trade Practices Act forbids. The Nikko Fund does not, through its operation, engender a likelihood of confusion regarding the source or affiliation of IPOX's mark. Any contention by IPOX that the defendants, while creating the Fund, violated the Deceptive

Trade Practices Act, sets up a claim grounded in past conduct, which is insufficient. *Camasta*, 761 F.3d at 740 ("[P]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief.") (internal quotations and citations omitted). Without evidence of a likelihood of future harm—which is wholly absent here—summary judgment for the defendants on this claim is appropriate.

### C.  Count 6:  Dilution under the Illinois Trademark Registration and Protections Act and Illinois common law

IPOX alleges that the defendants diluted its mark through its unauthorized use. To prevail on a dilution claim, IPOX must establish, through proof of actual dilution, that the defendants' use of the IPOX mark diluted its distinctive quality. 765 ILCS 1036/65(a); *Sullivan v. CBS Corp.*, 385 F.3d 772, 779 (7th Cir. 2004); *Doctor's Data, Inc. v. Barrett*, 170 F. Supp. 3d 1087, 1100 (N.D. Ill. 2016).[4] The defendants correctly argue that IPOX has failed to present any evidence of actual dilution. Nikko Mem. for Summ. J. at 16; Lazard Mem. for Summ. J. at 12-13. Because no reasonable jury could find in IPOX's favor in the absence of such evidence, the defendants are entitled to summary judgment on Count 6.

### D.  Count 8:  Unfair business practices and unfair competition under the Consumer Fraud and Deceptive Business Practices Act

IPOX alleges that LAM and LJAM engaged in unfair and deceptive acts prohibited by the Consumer Fraud and Deceptive Business Practices Act (Consumer Fraud Act). Specifically, IPOX bases its claim on Lazard's involvement "in the creation and dissemination of the Nikko Fund marketing material." IPOX Mem. for Summ. J. at 35. Though the Consumer Fraud Act is intended to regulate deceptive conduct directed

---

[4] The parties have not directed the Court's attention to any case law that indicates this analysis differs for a common law dilution claim.

towards consumers, businesses may sue other businesses under the act if they can show a nexus between their suit and "trade practices directed to the market generally" or "consumer protection concerns." 815 ILCS 505/2; *Athey Prod. Corp. v. Harris Bank Roselle*, 89 F.3d 430, 436-37 (7th Cir. 1996). The conduct must occur "primarily and substantially" in Illinois. *Barbara's Sales, Inc. v. Intel Corp.*, 227 Ill. 2d 45, 60, 879 N.E.2d 910, 919 (2007).

The defendants are entitled to summary judgment on this claim, for two reasons. First, there is an insufficient nexus between the complained-of conduct and consumer protection concerns. Second, the conduct did not occur primarily and substantially in Illinois.

First, no reasonable jury could find a nexus between the New York City presentation and the consumer protection interests that the Consumer Fraud Act is intended to protect. IPOX attempts to analogize this case to *Gold v. Golden G.T., LLC*, No. 05-C-288, 2005 WL 2465815 (N.D. Ill. Oct. 4, 2005). In *Gold*, the court held that there was a nexus between a dispute between former business partners and consumer protection concerns, as the plaintiff alleged that the former partner misled the public about the defendant's involvement in the marketplace. *Id.* at *4-5. Unlike in *Gold*, in which the underlying conduct involved representations made directly to consumers, the conduct underlying IPOX's claim involves representations made by business entities (Nikko, LJAM, and LAM) to other entities (SMBC Nikko). IPOX's case is better analogized to cases between business entities in which no nexus with the general marketplace was found. *See Am. Broad. Co. v. Maljack Prods., Inc.*, 34 F. Supp. 2d 665, 680-81 (N.D. Ill. 1998) (granting summary judgment to defendant in a licensing

24

dispute between media distributors, as plaintiff failed to demonstrate a nexus); *Nakajima All Co. v. SL Ventures Corp.*, No. 00 C 6594, 2001 WL 641415, at *2-3 (N.D. Ill. June 4, 2001) (dismissing plaintiff's complaint for failure to allege a nexus between consumer protection concerns and dispute between manufacturers, distributors, and retailers). A presentation in New York City by financial services companies to an investment trust for a product that an Illinois investor is ineligible to purchase does not give rise to a concern that the consumers of Illinois are at risk.

This leads the Court to the second basis for summary judgment. The defendants are also entitled to summary judgment on IPOX's Consumer Fraud Act claim because the conduct did not occur in Illinois. "[T]he Illinois Consumer Fraud Act applies only to fraudulent transactions which take place 'primarily and substantially' in Illinois." *Barbara's Sales*, 227 Ill. 2d at 60. In *Avery*, the Illinois Supreme Court held that out-of-state plaintiffs alleging that an insurer's use of second-rate parts to repair their damaged automobiles could not bring an action under the Consumer Fraud Act when the allegedly offending conduct occurred outside Illinois. *Avery*, 216 Ill. 2d at 187-88, 835 N.E.2d at 854-55. Though the particular conduct giving rise to the suit itself need not occur in Illinois, "the circumstances relating to the transaction [must] occur primarily and substantially within [Illinois]." *Id.* at 186, 835 N.E.2d at 853.

The circumstances relating to Lazard's presentation before SMBC Nikko did not occur primarily and substantially within Illinois. In determining that the *Avery* plaintiffs' claims were outside the Consumer Fraud Act, the Illinois Supreme Court noted (1) the plaintiffs' residency, (2) the defendants' location, and (3) the location of the deceptive conduct. *Id.* at 188. These factors do not support upholding IPOX's claim. First, IPOX

is incorporated in Delaware with its principal place of business in Chicago. Schuster Decl. ¶ 2. Second, LAM is incorporated in Delaware and has its principal place of business in Chicago, Lazard LR 56.1 Stmt. ¶ 2, and LJAM is organized under the laws of Japan and headquartered in Tokyo, *id.* ¶ 3. Third, the deceptive conduct occurred at the presentation to SMBC Nikko in New York City. IPOX Ex. 189 at 78 (Kosaka deposition). All that ties the New York City presentation to Illinois is that the data describing IPOX's historical performance originated in Illinois, as did the mark. This is insufficient to characterize the conduct at issue as occurring "primarily and substantially" in Illinois. The Consumer Fraud Act does not apply to IPOX's claim. Lazard is entitled to summary judgment on Count 8.

## III.    Fraud

IPOX alleges that LAM and LJAM engaged in fraud. To prevail on a claim of fraud, the plaintiff must demonstrate the existence of each of the following: "(1) a false statement of material fact; (2) defendant's knowledge that the statement was false; (3) defendant's intent that the statement induce the plaintiff to act; (4) plaintiff's reliance upon the truth of the statement; and (5) plaintiff's damages resulting from reliance on the statement." *Tricontinental Indus., Ltd. v. PricewaterhouseCoopers, LLP*, 475 F.3d 824, 841 (7th Cir. 2007) (internal quotation marks omitted).

The Court declines to enter summary judgment for defendants on Count 7. There is enough evidence for a reasonable jury to find that Lazard knowingly made false statements to IPOX with hopes that it would continue to provide free access to, and information about, the IPOX index, and that IPOX relied on those statements by continuing to provide the information to its detriment.

First, a reasonable jury could find that individuals at Lazard knowingly made false statements to Schuster. Not every statement that IPOX contends was fraudulent deserves this characterization. For instance, IPOX claims that Krenn made a false statement when he e-mailed Schuster to state "I will advise in a few weeks how we would like to proceed." IPOX Mem. for Summ. J. at 31. A general statement of "unfulfilled promise[]" is insufficient to establish a materially false statement of fact. *Ass'n Ben. Serv. Inc. v. Caremark RX, Inc.*, 493 F.3d 841, 853 (7th Cir. 2007). Yet, a reasonable jury could easily find that Kambara, an employee of LJAM, made a material false statement of fact in his e-mail to Schuster when he denied LJAM was involved in the creation of any IPO fund. Lazard Ex. 89 at IPOX00001755 ("Actually, we don't decide to launch a IPO fund now . . ."). Kambara stated this after his supervisor, Minoru Kosaka, wrote: "Pls do not mention about the IPO fund yet as we are still negotiating fees with this guy. Perhaps just to say we are doing research on the IPO index would be better." IPOX Ex. 130 at LAM00061607. Although no reasonable jury could find that Krenn's statement telling Schuster they will "advise in a few weeks" to be a false statement of fact, a reasonable jury could find that Kambara's statement to Schuster denying the creation of an IPO fund was false.

The six remaining statements that Lazard identifies also present issues that a jury must decide. *See* Lazard Mem. for Summ. J. at 21-24. Lazard argues that certain "non-factual" statements regarding the future are not actionable as fraud. *Id.* at 21. Specifically, Lazard employees told IPOX they would be able to "work together" and that IPOX's "support during the trial term must be great help for us to recommend your index to our index team." *See* Lazard Ex. 89 at IPOX00001753-55. "The general rule in

Illinois denies recovery for fraud based on a false representation of intention or future conduct, but there is a well recognized exception, where, as here, the false promise or representation of future conduct is claimed to be the scheme used to accomplish the fraud." *Carroll v. First Nat. Bank of Lincolnwood*, 413 F.2d 353, 358 (7th Cir. 1969). *See also Panoramic Stock Images, Ltd. v. Pearson Educ., Inc.*, No. 12 C 9918, 2013 WL 2357586, at *4 (N.D. Ill. May 29, 2013) (denying defendant's motion to dismiss a fraud claim, as plaintiff adequately alleged the defendant misrepresented its future conduct in order to secure a cheaper license) (citing *Carroll*, 413 F.2d at 358). A jury reasonably could conclude that Lazard employees made false statements regarding future conduct to carry out a fraudulent scheme.

IPOX has presented sufficient evidence for a jury to conclude that Lazard made false statements in order to extend its access to Schuster and the free trial of IPOX data by concealing its actual conduct. When Schuster first extended a free trial to LAM employees, he told Krenn a product license would be required if IPOX data was used to create a product. Lazard Ex. 97 at LAM00000416. Similarly, after receiving information that LAM and LJAM were creating an IPO fund, Schuster again began to push Lazard to obtain a product license. Lazard Ex. 94 at IPOX00002226.

IPOX argues Lazard misrepresented its work on the Nikko Fund to extend its free use of the IPOX data. Kambara directly reversed himself on whether the Nikko Fund existed upon his supervisor's instruction and after Schuster asked about a license. Lazard Ex. 89 at IPOX00001755. Similarly, after Schuster e-mailed Krenn to tell him he knew of the launch of the Nikko Fund, Krenn's response e-mail implied that he didn't know of any new fund, which was plainly untrue. *Compare* Lazard Ex. 95 at

LAM00001144 (e-mail on September 7 informing Krenn that Lazard is developing an IPO fund); IPOX Ex. 90 at LAM00446430 (Krenn, in an October 29 e-mail to Schuster: "What fund launch?"). A reasonable jury could find that Lazard figured that disclosing that it was aiding Nikko in creating an IPO-based product, while denying the need for a product license, would have jeopardized its access to Schuster and the IPOX data. This is a "reasonable inference[ ] supported by the record" to which IPOX is entitled on Lazard's motion for summary judgment. *Yannacopoulos*, 652 F.3d at 823.

IPOX has also provided sufficient evidence for a jury reasonably to conclude that it relied upon Lazard's fraudulent assertions. IPOX argues that, but for Lazard's misrepresentations, Schuster would not have continued to extend benefits to Lazard. IPOX Mem. for Summ. J. at 34. IPOX notes that it repeatedly renewed the free trial while receiving fraudulent assurances from Lazard that it was not working on an IPO product. *Id.* As Lazard correctly points out, IPOX does not offer any *direct* evidence that it relied on Lazard's claim that it was not working on an IPO-based product. Lazard Mem. for Summ. J. at 22. IPOX, however, is entitled to all reasonable inferences in its favor at this stage of the case. *Yannacopoulos*, 652 F.3d at 823. A reasonable jury could infer that IPOX, whose sole business activity is licensing its indexes, would not have shared information with Lazard for free had Lazard honestly represented that it planned to use, and was using, IPOX's data and resources to develop a product without first securing a product license.

In its motion for summary judgment, Lazard argues that IPOX cannot demonstrate that it relied on any of its misrepresentations, as Schuster's behavior did not change before and after allegedly learning in an e-mail exchange that Lazard was

engaged in building an IPO fund.  Lazard Mem. for Summ. J. at 24.  This misstates the record of the exchange.  First, in an e-mail introduction, Kambara stated "I am Shintaro Kambara . . . I have been involved in IPO fund with Minoru Kosaka."  Lazard Ex. 142 at IPOX00006875.  In response, Schuster promptly asked Kambara to "elaborate on the potential commercial arrangement between Lazard and IPOX Schuster in case a respective fund is launched[.]"  Lazard Ex. 89 at IPOX00001755.

Kosaka, who was Kambara's manager and was included on the e-mail disclosing the Nikko Fund, contacted Kambara directly and instructed him not to mention the Fund to Schuster, "as we are still negotiating fees with this guy."  IPOX Ex. 130 at LAM00061606.  Kambara then followed up to tell Schuster that Lazard had not decided to launch an IPO fund at that point "and we are conducting due diligence of relevant IPO Index."  Lazard Ex. 89 at IPOX00001755.  "I believe we can offer you a really good service to make it a very successful product," Schuster responded.  Lazard Ex. 89 at IPOX00001754.

Contrary to Lazard's characterization—specifically, that Schuster learned defendants were creating an IPO fund but blithely continued sharing confidential information—a reasonable jury could find that Schuster immediately sought to put a product license in place upon learning that Lazard might be launching a fund.  When Kambara falsely asserted that no such fund existed, Schuster stated that IPOX would be able to provide support for a product were it launched in the future.  A jury reasonably could infer that Schuster relied on LJAM misrepresentations about the existence of a fund.

Finally, IPOX has provided evidence sufficient to support an award of damages.

Duski Decl. ¶ 6-8. IPOX argues it is entitled to damages from "any injury which is the direct and natural consequence of his acting on the faith of defendant's representations." *Giammanco v. Giammanco*, 253 Ill. App. 3d 750, 763, 625 N.E.2d 990, 1000 (1993) (internal quotation marks omitted) . IPOX, through the declaration of David Duski, has offered estimates of damages based upon theories of unjust enrichment, non-payment of royalties, and unpaid licensing fees. Duski Decl. ¶¶ 6-8. Lazard contends that IPOX cannot demonstrate damages, as IPOX stipulated that the company was not damaged as a whole by the defendants' conduct. *See* Stip. and Agreed Order Re. Pl.'s Alleged Damages ¶ 1 ("IPOX will not argue or take the position in this case, whether at trial or otherwise, that IPOX Schuster, LLC as a whole was damaged by Defendants' alleged conduct.").

The Court is unpersuaded that this stipulation bars IPOX from recovering damages from Lazard for fraud. The object of the stipulation was "to clarify and confirm the *types* of damages being sought." *Id.* (emphasis added). By stipulating that "IPOX Schuster, LLC as a whole" was not damaged, IPOX did not give up all of its potential damages, just those arising from damage to the company as a whole. But "[c]ompensatory damages for fraud are intended to compensate for *any* injury which is the direct and natural consequence of [the plaintiff's] acting on the faith of defendant's representations." *Roboserve, Inc. v. Kato Kagaku Co., Ltd.*, 78 F.3d 266, 273-74 (7th Cir. 1996) (emphasis added). In other words, damages to the plaintiff entity itself are not the only damages available to IPOX. If IPOX can show that the damages described in the Duski declaration were proximately caused by the fraudulent conduct it alleges, it is not precluded from recovering these damages.

For these reasons, the Court therefore declines to grant Lazard's motion for summary judgment on Count 7.

Lazard has also moved for summary judgment on IPOX's request for punitive damages in the fraud claim. Lazard Mem. for Summ. J. at 25. Punitive damages are only appropriate "where the false representations are wantonly and designedly made." *Jannotta v. Subway Sandwich Shops, Inc.*, 125 F.3d 503, 511 (7th Cir. 1997) (internal quotations and citations omitted). Whether a false representation was willful is a factual question generally reserved for the jury to determine. *Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 815-16 (7th Cir. 2017). The Court declines to resolve it on summary judgment, as there is evidence from which a reasonable jury could make such a finding.

## IV.   Contract

### A.      Count 9:  Breach of contract against Nikko

IPOX alleges that Nikko breached an express contract. To sustain a breach of contract claim, IPOX must first demonstrate the existence of a valid and enforceable contract. *Priebe v. Autobarn, Ltd.*, 240 F.3d 584, 587 (7th Cir. 2001). The Court grants summary judgment for Nikko, as no reasonable jury could conclude that an express contract was ever formed between IPOX and Nikko.

IPOX and Nikko engaged in lengthy negotiations over the possibility of a contract. Ronald Cajetan, a Nikko employee, first contacted Schuster on August 18 to request a data license. Nikko Ex. K at IPOX00001525. After negotiations, Schuster e-mailed a contract conferring a data license on September 4. Nikko Ex. N at IPOX00007060. Cajetan first stated that Nikko was "OK to move forward with the signing" and asked for a PDF file for Nikko to sign. *Id.* Before Schuster could respond,

Cajetan sent a second e-mail: "I got a phone call from our business side just after emailing you the below email to put on hold in executing this contract. . . . This is pending our business side decision now." *Id.* In October, Schuster learned of the Nikko Fund. Nikko Ex. P at NIKKO_0000151. He contacted Cajetan again to resolve the alleged infringement. *Id.* Negotiations resumed, and Cajetan and Schuster exchanged new proposals. Nikko Ex. Q; Nikko Ex. R. Cajetan sent a revised version of the contract to Schuster. Nikko Ex. S at IPOX00004858. On October 28, Schuster executed the contract and offered to send it to Cajetan. *Id.* Cajetan asked to first review the revised version of the agreement. *Id.* Schuster agreed to send the new version and offered to include additional services. *Id.* The next day, October 29, Schuster e-mailed Cajetan: "Please see attached. Let me know if you are OK with countersigning and then I will mail the original documents to you." Nikko Ex. T at IPOX00000652. Cajetan rejected this proposed contract, Nikko Ex. U at IPOX00001682, and the parties continued to negotiate. *See* Nikko Ex. W at IPOX00005198 (Schuster proposing a contract with different terms). IPOX contends that the document attached to Schuster's October 29 e-mail is the express contract between IPOX and Nikko. IPOX Mem. for Summ. J. at 35.

Did IPOX and Nikko mutually assent to a contract on October 28? Two facts indicate that no express contract was ever formed. First, the written contract, which anticipated signatures from both parties, was never signed by Nikko. Nikko Mem. for Summ. J. at 17. Illinois law generally does not treat a written contract as binding until both parties have executed the document. *Sterdjevich v. RMK Mgmt. Corp.*, 343 Ill. App. 3d 1, 14 (2003). As the Seventh Circuit has noted, determining whether signing of

the contract was actually a condition precedent may require the court to look to the intention of the parties. *Consol. Bearings Co. v. Ehret-Krohn Corp.*, 913 F.2d 1224, 1231 (7th Cir. 1990). IPOX and Nikko both expressed, through their e-mails, an intention that the other party sign the contract in order to finalize the agreement. *See, e.g.,* Nikko Ex. T at IPOX00000652 ("Let me know if you are OK with countersigning[.]").

Second, after the point at which IPOX alleges the contract was formed, neither party performed under the contract for months. Nikko Mem. for Summ. J. at 17. The claimed agreement states "IPOX shall ensure that Nikko will receive data for the IPOX Indexes on each U.S. trading day . . . by approximately 6 p.m. EST." Nikko Ex. T at IPOX00000659. IPOX claims a contract was formed on October 28. IPOX Mem. for Summ. J. at 35. Yet, IPOX never delivered data to Nikko until February—four months after the contract was allegedly formed. Nikko Ex. C at 413. Schuster, in a deposition, conceded that he only began to perform upon advice of counsel. *Id.* at 408, 411-13. IPOX attempts to explain this by suggesting it was delivering the data to Nikko's investment advisor, Lazard. IPOX Mem. for Summ. J. at 37. This is unconvincing, as IPOX had already extended Lazard a data license under a "free trial" before the purported contract between IPOX and Nikko was ever formed. Moreover, the claimed contract does not provide for IPOX to deliver these data reports to Lazard. Nikko Ex. T at IPOX00000659.

In addition, in the period between the alleged formation of the contract and its claimed performance, Schuster continued to offer Cajetan new agreements with different terms. *See, e.g.,* Nikko Ex. W at IPOX00005198 (Schuster proposing a contract with different terms); Nikko Ex. Z at IPOX00004133 (same). No reasonable

jury could find that an express contract was formed between Nikko and IPOX.  Nikko is entitled to summary judgment on Count 9.

**B.** **Count 10:  Breach of implied contract against Nikko**

IPOX alleges in the alternative that Nikko breached an implied-in-fact contract. An implied-in-fact contract may be created through the parties' conduct.  *Marcatante v. City of Chicago*, 657 F.3d 433, 440 (7th Cir. 2011).  Unlike an express contract, which is formed through an oral or written agreement, an implied-in-fact contract "is inferred from the conduct of the parties in the milieu in which they dealt."  *Id.*  (internal quotations and citations omitted).

IPOX has not presented evidence of dealings between Nikko and IPOX from which the existence of a contract—that is, an agreement by Nikko to pay IPOX for what it was getting—may be inferred.  IPOX did not perform under the purported contract for months after its creation.  Rather, the relationship between Nikko and IPOX was marked by a lengthy and never-consummated negotiation over whether to form a contract, not by performance under a contract.  Once IPOX began to "perform," Nikko asked it to stop.  Nikko Ex. C at 415-16.  No reasonable jury could infer from Nikko and IPOX's conduct that the parties had reached an implied-in-fact contract.  Nikko is entitled to summary judgment on Count 10.

**C.** **Personal jurisdiction over Nikko**

Nikko argues that, if the Court grants summary judgment against IPOX on Counts 9 and 10—as the Court has—it must be dismissed for a lack of personal jurisdiction.  Nikko contends IPOX cannot show that Nikko had sufficient contacts in Illinois in the absence of the contract-related claims.  Nikko Mem. for Summ. J. at 20.

Nikko previously moved under Federal Rule of Civil Procedure 12(b)(2) to dismiss for lack of personal jurisdiction. In denying that motion, the Court reviewed Nikko's contacts with Illinois that permitted exercise of jurisdiction over the company:

> Nikko corresponded with IPOX repeatedly, both before and after IPOX sent a cease-and-desist letter in October 2014. IPOX alleges that Nikko then reached into Illinois by infringing IPOX's trademark rights and attempting to capitalize on IPOX's reputation and goodwill with knowledge that IPOX had built its reputation and would be injured in Illinois. Nikko purposefully directed its conduct at Illinois, and could reasonably foresee being haled into court here.

*IPOX Schuster*, 191 F. Supp. 3d at 800-01. All of this is still true and is supported by the evidence IPOX has adduced. The Court therefore declines to dismiss the remaining claims against Nikko for lack of personal jurisdiction.

### D. Count 11: Breach of implied contract against LAM

IPOX also contends that LAM breached an implied-in-fact contract. To prevail on a breach of an implied-in-fact contract, a plaintiff must establish, through evidence of the parties' conduct, all of the elements of a traditional contract, including offer, acceptance, and consideration. *Marcatante*, 657 F.3d at 440.

IPOX argues that a contract should be implied from its course of conduct with LAM, but it does not describe very well the nature of the contract it contends was formed. IPOX argues that its contract with LAM was formed after Krenn contacted Schuster to establish access to IPOX data on Bloomberg. IPOX Mem. for Summ. J. at 37-38; Lazard Ex. 97 at LAM00000415-16. Schuster provided several LAM employees a free trial. IPOX Mem. for Summ. J. at 37-38. Schuster also noted that a license would be required if LAM intended to use IPOX to create a product. *Id.* From these facts, IPOX claims a contract was formed, as Lazard used the IPOX products and IPOX

performed under the terms of the free trial.  IPOX Mem. for Summ. J. at 38.

As Lazard correctly argues, IPOX cannot build an implied-in-fact contract from these facts.  Lazard Mem. for Summ. J. at 15-16.  When did Lazard manifest its assent to a contract?  What is the price term upon which the parties agreed?  What consideration did IPOX receive (or even seek) for this access to its data?  Without any evidence on any of these questions—and IPOX has proffered none—no reasonable jury could find that an implied-in-fact contract was formed.   LAM is entitled to summary judgment on Count 11.

### D.    Count 12: Unjust enrichment

IPOX alleges that the defendants were unjustly enriched by their wrongful conduct.  To establish an unjust enrichment claim, a plaintiff must prove "the defendant has unjustly retained a benefit to the plaintiff's detriment, and that the defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience."  *Gagnon v. Schickel*, 2012 IL App 120645, ¶ 25, 983 N.E.2d 1044, 1052.  The plaintiff must show some other "unlawful or improper conduct as defined by law, such as fraud, duress, or undue influence, or, alternatively, it may be based on contracts which are implied in law."  *Id.* (internal quotation marks omitted).  Though some Illinois courts have recognized unjust enrichment as an independent cause of action, *Cleary v. Philip Morris Inc.*, 656 F.3d 511, 516-17 (7th Cir. 2011), IPOX has alleged unjust enrichment as a claim dependent upon the other claims in its complaint. IPOX Mem. for Summ. J. at 39 ("IPOX's claim can only be dismissed if this Court dismisses every claim").  Because several of IPOX's claims survive this motion, the Court denies the defendants summary judgment on the unjust enrichment claim.

### E.  Count 13:  Tortious interference with contract against LAM

In Count 13, IPOX alleges that LAM interfered in its contract with Nikko.  The first requirement of a plaintiff who intends to state a claim for tortious interference with a contract is that a valid contract exists between the plaintiff and another party.  *Comp. Conf. Coordinators, Inc. v. Kumon N. Am., Inc.*, 394 Ill. App. 3d 105, 109, 915 N.E.2d 88, 92 (2009).  Because the Court has concluded that no reasonable jury could find that either an express or an implied contract existed between IPOX and Nikko, there is no valid contract upon which IPOX can base its tortious interference claim.  LAM is entitled to summary judgment on Count 13.

### F.  Count 14:  Tortious interference with prospective business relationship against LAM

IPOX alleges that LAM interfered in the prospective business relationship between it and Nikko.  To state a claim for tortious interference in a prospective business relationship, a plaintiff must establish "(1) the plaintiff's reasonable expectation of entering into a valid business relationship; (2) the defendant's knowledge of the plaintiff's expectancy; (3) purposeful interference by the defendant that prevents the plaintiff's legitimate expectancy from ripening into a valid business relationship; and (4) damages to the plaintiff resulting from such interference."  *Botvinick v. Rush Univ. Med. Ctr.*, 574 F.3d 414, 417 (7th Cir. 2009) (internal quotation marks omitted).

IPOX's claim rests entirely upon an e-mail exchange between Schuster and Cajetan, a Nikko employee.  IPOX Mem. for Summ. J. at 40.  After Schuster sent over an updated contract, prepared for Cajetan to countersign, Cajetan declined to execute it.  Nikko Ex. U at IPOX00001682.  In the e-mail, Cajetan wrote:  "Lazard Asset Management is entrusted with the operation of the fund and we believe that they have

already paid the fees for the [IPOX index]." *Id.* From this, IPOX infers that Nikko withdrew from the agreement because Lazard instructed it to do so. IPOX Mem. for Summ. J. at 40. As LAM correctly notes, this e-mail—even if read liberally—does not provide evidence that LAM influenced Nikko's decision. Lazard Reply Br. at 4 n.9. Without more, IPOX has not offered evidence from which a reasonable jury could find that LAM knew IPOX expected to enter into a contract with Nikko or that LAM purposefully interfered in that relationship. *Botvinick*, 574 F.3d at 417. Because no reasonable jury could find in IPOX's favor in the absence of those elements, LAM is entitled to summary judgment on Count 14.

## V. Affirmative defenses

IPOX has moved for summary judgment on the defendants' affirmative defenses of waiver, estoppel, and ratification. Summary judgment may be appropriate for defenses, as well as claims. Fed. R. Civ. P. 56(a). IPOX argues it is entitled to summary judgment on all defenses, as no reasonable jury could find that it "gave its valuable trademark, trade secret and nonconfidential information to Defendants 'gratuitously and without restriction.'" IPOX Mem. for Summ. J. at 42.

Summary judgment is inappropriate, for a reasonable jury could find that Schuster gave away IPOX's trade secrets without restriction.[5] Long before any discussions between Schuster and Krenn regarding a license, Schuster provided Miller, a LAM employee, a manual for the IPOX indexes and other allegedly confidential information. Lazard Ex. 84 at IPOX00003073. During his deposition, Schuster

---

[5] It is not at all clear that this is actually an "affirmative defense" under the law, but the Court will address the issue without deciding that point, because it is unquestionably an issue in the case.

confirmed that there were no protections on this freely-shared information aside from his assumption that there was an industry convention that Lazard would agree to a license. Lazard Ex. at 14 at 480 (Schuster deposition). Schuster then gave LAM employees a free trial. Lazard Ex. 97 at IPOX00000415. Krenn stated that he did not believe that Schuster "place[d] any limits, terms or conditions on what anyone at Lazard could do with the information received through the free trial." IPOX Ex. 84 at 118 (Krenn deposition). Likewise, Schuster also provided information to LJAM and, through them, Nikko. IPOX Ex. 210 at 54-55 (deposition of Shintaro Kambara, describing the information flow from IPOX to LJAM to Nikko); IPOX Ex 240 at 68-69 (same). The evidence is not so lopsided as to warrant summary judgment in favor of the *defendants*, as Schuster took some steps to protect the confidentiality of the information. *See* Lazard Ex. 14 at 491-92 (IPOX materials marked confidential). But a reasonable jury could find from this evidence that IPOX gave up its confidential information for free.

### Conclusion

The Court's previously issued memorandum opinion and order, reported at 2017 WL 6625987 (Dec. 28, 2017), is vacated. For the reasons stated above, the Court grants defendants' motions for summary judgment in part and denies them in part [dkt. nos. 141, 143]. Summary judgment is granted in favor of both defendants on Counts 1, 5, 6, 8, 9, 10, 11, 13, and 14 of plaintiff's amended complaint. With regard to Count 2, the Court grants summary judgment to the defendants to the extent the claim is based on information IPOX has publicly released as identified in this decision, but otherwise denies the motion. With regard to Count 3, the Court holds that both defendants are entitled to summary judgment on this claim to the extent it involves marketing activities

that occurred in Japan regarding Nikko's website, but not otherwise.  The Court

otherwise denies the defendants' motions.   The Court also denies IPOX's motion for

summary judgment regarding the defendants' affirmative defenses [dkt. no. 147].

_____
MATTHEW F. KENNELLY
United States District Judge

Date:  January 20, 2018